**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

JUSTIN GRAY,

Defendant.

Case No.: 1:20-cr-00238-JLT-SAB-17

ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S AND GOVERNMENT'S MOTIONS IN LIMINE

(Docs. 2121, 2122, 2123, 2125, 2126, 2127, 2128, 2131, 2132, 2134, 2135, 2136, 2138, 2142, 2143, 2144, 2146, 2147)

The criminal trial of Defendant Justin Gray is scheduled to commence on August 18, 2026. The parties have submitted several motions in limine regarding evidence expected to be presented at trial. The Court heard argument on the motions on July 27, 2026, and having considered the entire record, and for the reasons stated below, the Court rules as follows.

## I. BACKGROUND

In its Fourth Superseding Indictment filed on July 10, 2025, the Government charged Justin Gray, aka "Sidetrack," with two counts of Murder in Aid of Racketeering under 18 U.S.C. § 1959(a)(1) and (2). (*See* Fourth Superseding Indictment, Doc. 1970 at 11–12.) Because Gray is charged with a predicate offense under 18 U.S.C. § 1959(a), Violent Crimes in Aid of Racketeering ("VICAR"), the Government is required to prove that Defendant committed the predicate offense—in this case, murder—with the intent to "gain entrance to, or [] maintain, or [] increase [his or her] position in the enterprise." Model Crim. Jury Instr. 9th Cir. 18.8 (2024); 18

U.S.C. § 1959(a).

The Government alleges that on or about October 4, 2020, Gray murdered Victim-1 and Victim-2 during a shooting in Lomita, California, for the purpose of gaining entrance to and maintaining and increasing position in the Aryan Brotherhood ("AB"), "an enterprise engaged in racketeering activity." (Doc. 1970 at 11.) As offered in the Fourth Superseding Indictment, the "Aryan Brotherhood is a white, race-based gang that was formed in the in the California prison system in about 1964 by white inmates who wanted to gain power and authority in prison." (*Id.* at 2, ¶ 4.) The AB "is a criminal organization whose members and associates engaged in drug trafficking, theft, and acts involving murder, extortion, burglary, robbery and assault" in an effort to control illegal activities within the California prison system, to enrich its leaders, members, and associates, to preserve, protect and expand the AB's power, and to use threats and violence to "keep victims in fear of the AB." (*Id.* at 1–4, ¶¶ 1, 14.) Led by a "three-man commission with authority over the entire enterprise," the AB achieves its ends by authorizing and condoning members and associates to murder, intimidate, and assault those who jeopardize the AB's operations. (*Id.* at 2–3 ¶¶ 7, 10.) Likewise, "[m]embers who do not fulfill their obligations to the AB are subject to murder." (*Id.* at 3, ¶ 10.)

## II. LEGAL STANDARD

"A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) (citations omitted). "Although the Federal Rules of Evidence do not explicitly authorize in limine rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (citations omitted).

The Ninth Circuit explained that motions in limine "allow parties to resolve evidentiary disputes ahead of trial, without first having to present potentially prejudicial evidence in front of a jury." *Brodit v. Cabra*, 350 F.3d 985, 1004–05 (9th Cir. 2003) (citations omitted). However, "a motion in limine should not be used to resolve factual disputes or weigh evidence," *C & E Services, Inc. v. Ashland Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008), as that is the province of the jury. *See Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 150 (2000). The Court will

bar use of the evidence in question only if the moving party establishes that the evidence clearly is not admissible for any valid purpose. *Jonasson v. Lutheran Child & Family Services*, 115 F.3d 436, 440 (7th Cir. 1997).

The rulings on the motions in limine made below do not preclude either party from raising the admissibility of the evidence discussed herein, if the evidence adduced at trial demonstrates a change of circumstances that would make the evidence admissible, such as for impeachment or if the opponent opens the door to allow for its admissibility. However, if this occurs, the proponent of the evidence **SHALL** raise the issue with the Court outside the presence of the jury. Finally, the rulings made here are binding on all parties and their witnesses and not merely on the moving party.

## III. DEFENDANT GRAY'S MOTIONS

### A. Character Evidence to Prove Propensity: Rules 404(b) & 403

"Rule 404(b)[(1)] prevents the admission of 'other crimes, wrongs, or acts' to prove the character or criminal propensity of a defendant, but permits such evidence to be used for the limited purposes of proving 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.' [Fed. R. Evid. 404(b)(2).] This rule is inapplicable, however, where the evidence the government seeks to introduce is directly related to, or inextricably intertwined with, the crime charged in the indictment." *United States v. Lillard*, 354 F.3d 850, 854 (9th Cir. 2003) (citations omitted).

The Ninth Circuit has recognized two categories of evidence that is "inextricably intertwined" with a charged offense such that it does not violate Rule 404(b)(1). *United States v. DeGeorge*, 380 F.3d 1203, 1220 (9th Cir. 2004) (citations omitted). First, "evidence of prior acts may be admitted if the evidence 'constitutes a part of the transaction that serves as the basis for the criminal charge.'" *Id.* (citations omitted). Second, "prior act evidence may be admitted 'when it was necessary to do so in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime.'" *Id.* (citations omitted). For either category, "[t]here must be a sufficient contextual or substantive connection between the proffered evidence and the alleged crime to justify exempting the evidence from the strictures of Rule 404(b)."

*United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1013 (9th Cir. 1995).

The first category involves a prior act that formed part of the *same* criminal episode for which the defendant was charged. *See Lillard*, 354 F.3d at 854 (allowing the government to present evidence that defendant stole cocaine from the very shipment he was delivering, where he was charged with conspiracy to possess and distribute cocaine, because it formed part of a single criminal episode, identified the defendant as the delivery driver, and established defendant's knowledge of the contents of the illegal shipment). The second category involves prior acts that provide "important factual connection to several counts contained in the indictment" *DeGeorge*, 380 F.3d at 1220, such that it provides an explanation of the "time, place, and circumstances of the acts which form the basis of the charge." *Vizcarra-Martinez*, 66 F.3d at 1013 (citations and quotations omitted); *see also United States v. Daly,* 974 F.2d 1215, 1216 (9th Cir. 1992) (allowing evidence that defendant was involved in a shoot-out where he was charged with being a felon in possession of a firearm because that was the context behind the charged crime and it helped prove defendant's possession of gun, as well as rebut his proffered claim of self-defense). Additionally, "in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise" and such evidence is "not considered other-crimes subject to Federal Rule of Evidence 404(b)." *United States v. Baez*, 349 F.3d 90, 93 (2d Cir. 2003).

1. Limitation of Crimes Committed by Others and Exclusion of Defendant Gray's Prison Assaults and Weapon Possession as Irrelevant & Prejudicial (Doc. 2121)[1]

The Government seeks to introduce evidence of (1) codefendant and AB member Clement's EDD fraud/ drug trafficking activities; and (2) Gray's prior prison assaults and weapon possession to prove the existence of a criminal enterprise, explain Gray's role within that enterprise, and explain why victim Roshanski was targeted by the enterprise. (*See* Doc. 2181 at 1,

[1] Though Defendant also challenges the admission of the 2022 Pomona murders regarding Victims 11 & 12, and the 2022 kidnapping regarding Victim 18, (*see* Doc. 2121 at 4), the Government indicates that "[a]t this stage, [it] does not intend to offer evidence of murders of Victim-11 and Victim-12 . . . or the kidnapping of Victim-18." (Doc. 2181 at 2.) Accordingly, the Court need not address these arguments.

3–5.) The Court finds that the evidence of the AB's racketeering activities, including the EDD fraud conducted by co-defendant Clement, is admissible because it helps prove an element of the crime charged, *Baez*, 349 F.3d at 93, and provides the "story regarding the commission of the crime" *DeGeorge*, 380 F.3d at 1220. However, evidence regarding Gray's prior prison assaults and past possession of drugs and weapons is inadmissible under Rule 404(b)(1) because there is no link between these prison assaults and the larger AB enterprise.

*a. Evidence of Codefendant Clement's EDD Unemployment Fraud and Drug Trafficking Activities*

Evidence of the AB's EDD unemployment fraud and drug trafficking enterprise, and by extension codefendant Clement's involvement in such scheme, is admissible because it proves an element of the crime charged. As noted, Gray is charged with two counts of violent crimes in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1), (2), for the murders of Allan Roshanski and Ruslan Magomedgadzhiev. (*See* Doc. 1970 at 11.) VICAR requires proof: "(1) that the criminal organization exists; (2) that the organization is a racketeering enterprise; (3) that the defendant[] committed a violent crime; and (4) that [the defendant] acted for the purpose of promoting [his] position in a racketeering enterprise." *United States v. Banks*, 514 F.3d 959, 964 (9th Cir. 2008) (internal citations omitted).

Each count in the indictment alleges that "[t]he AB enterprise, through its members and associates, engaged in racketeering activity as defined in 18 U.S.C. Sections 1959(b)(1) and 1961(1), that is, acts involving murder, extortion, and arson in violation of the California Penal Code, acts involving robbery in violation of the California Penal Code, multiple acts indictable under 18 U.S.C. §§ 1028, 1341, and 1343, and multiple offenses involving drug trafficking in violation of 21 U.S.C. §§ 841, 843, and 846." (*Id.* (emphasis added).) Further, under relevant statutory definitions, an "enterprise" includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce. 18 U.S.C. § 1959(b)(2). A "racketeering activity" means "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled

substance or listed chemical" as well as "any act which is indictable under any of the following provisions . . . section 1028 (relating to fraud and related activity in connection with identification documents)." 18 U.S.C. § 1961(1) (emphasis added).

Because fraud and drug trafficking fall under the definition of racketeering activities, evidence that the AB and codefendant Clement were engaged in EDD fraud and drug trafficking activities is probative to an element of the crime charged; the existence of a criminal enterprise. *See Baez*, 349 F.3d at 91, 93–94 (affirming the admission of sixteen uncharged robberies in a case where defendant was convicted of VICAR murder under 18 U.S.C. § 1959(a)(1) because it was relevant to proving a criminal enterprise and not unduly prejudicial as the uncharged conduct was less inflammatory than the indictment's murder charge); *United States v. Rolett*, 151 F.3d 787, 788–91 (11th Cir. 1998) (affirming the admission of defendant's uncharged thefts and burglaries in a case where defendant was convicted of VICAR conspiracy to commit murder under § 1959(a)(5) because it was probative to proving defendant's involvement in both the racketeering enterprise and conspiracy to commit murder).

Additionally, evidence of Clement's EDD fraud and drug trafficking activities is admissible because it provides a coherent and comprehensible story to the jury regarding the commission of the crimes in this case. The underlying theory in this case is that the AB targeted victim Roshanski because he refused to give the AB taxes on his EDD fraud earnings and allegedly took drugs belonging to the AB without paying for them. (Doc. 2181 at 7.) In doing so, codefendant Clement ordered Gray to kill Roshanski. (*Id*.) Therefore, evidence of Clement's fraud and drug trafficking activities provide context for why the AB, and by extension Gray, targeted Roshanski. (*See id*.) Afterall, to prevail in the crime charged, the Government must also show that Gray acted for "the purpose of gaining entrance to or maintaining or increasing position in [the criminal] enterprise." 18 U.S.C. § 1959(a). A jury could conclude that murdering Roshanski would have allowed Gray to gain favor with the AB enterprise and Clement, a known AB member. Thus, there is a "substantive connection between the proffered evidence and the alleged crime to justify exempting [such] evidence from the strictures of Rule 404(b)," *Vizcarra-Martinez*, 66 F.3d at 1013 ("The jury cannot be expected to make its decision in a void—without

knowledge of the time, place, and circumstances of the acts which form the basis of the charge.") (citations and quotations omitted).

Finally, the risk of unfair prejudice does not substantially outweigh the probative value of such evidence. Fed. R. Evid. 403. The evidence discussed above is being offered for a legitimate purpose under the rules of evidence—specifically, to prove an element of the crime and to explain the facts which form the basis for the charge. Such evidence is not being offered to prove Defendant's character or propensity to commit murder in violation of Rule 404(b)(1). Additionally, it is unclear whether this kind of evidence would even constitute "prior bad acts" under Rule 404(b)(1), because such evidence does not pertain to *Defendant's prior bad acts*, but rather that of his codefendant in the larger AB enterprise. *See United States v. Brady*, 26 F.3d 282, 286–87 (2d Cir. 1994) (explaining that, in case involving a §1959(a)(5) VICAR conspiracy to commit murder charge, the admission of evidence regarding murders committed by *other* enterprise members was admissible and did not implicate Rule 404(b) because "similar act evidence is relevant only if the jury can reasonably conclude . . . that *the defendant was the actor*") (citing *Huddleston v. United States*, 485 U.S. 681, 689 (1988)) (emphasis in original). Thus, the motion is **DENIED** as to this evidence. Nonetheless, the Court will provide a limiting instruction that such evidence is offered only to establish the existence of a criminal enterprise and Gray's role in the enterprise, rather than evidence of Gray's criminal disposition to commit murder.

*b. Evidence of Gray's 2018 and 2020 Prison Assaults and Weapon Possession*

The Government seeks to introduce evidence of two prior prison yard altercations, neither of which resulted in charges or convictions but only CDCR disciplinary actions. (Doc. 2121 at 5; Doc. 2181 at 2.) The first incident occurred on April 27, 2018, at Calapatria State Prison, when Gray and another inmate attacked a third inmate, striking him in the head and upper torso with improvised knife-like weapons.[2] (Doc. 2121 at 8–9; Doc. 2181 at 5.) The second incident

[2] According to the Government, this assault was classified as attempted murder due to the victim's degree of injuries and involved two improvised weapons: (a) a flat piece metal, sharpened to a point, with a cloth handle, just over six inches long; and (b) a metal rod, also sharpened to a point, and with a cloth handle,

occurred on January 20, 2020, at Kern Valley State Prison, when Gray and another prisoner attacked two non-white inmates, punching them in the face repeatedly before being separated by guards. (Doc. 2121 at 11; Doc. 2181 at 5.) Both incidents occurred prior to the October 2020 Lomita murders. (*See* Doc. 1120-1 at 8.) The Court finds that evidence of these two prior prison assaults is inadmissible character evidence because the Government fails to establish the link between these acts and Gray's involvement in the AB enterprise; thereby, rendering the admission of such evidence unduly prejudicial.

First, as mentioned above "[i]t is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise." *Baez*, 349 F.3d at 93. The Government argues that these prison assaults "demonstrate the existence of the enterprise and Gray's association with it." (Doc. 2181 at 8–9.) It is true that this kind of conduct generally falls "within the genre of the indictment," as the indictment here incorporates reference to the AB's purpose of preserving power through "intimidation, violence, threats, assaults, . . . and murder." (Doc. 1970 at 4, 11); *United States v. Fernandez*, 388 F.3d 1199, 1256 (9th Cir. 2004) (finding that the district court did not abuse its discretion in refusing to strike witness testimony regarding defendant's participation in ten conspiracies to commit murder or assault, even though he was not charged with such conduct in the indictment, because they fell "within the genre of the indictment").

However, the Government does not offer any information, facts, or anticipated testimony to directly connect Gray's prison assaults to the AB enterprise. (*See* Doc. 2181.) Instead, the Government draws general correlations between how Gray committed these assaults to how the AB commits prison assaults and concludes that the AB must have sanctioned Gray's actions because the AB rules otherwise penalize these kinds of acts without authorization. (*Id*. at 8–9.) Such generalities are insufficient to show that these acts are inextricably intertwined with the charged offense. *Cf. Fernandez*, 388 F.3d at 1256 n.39 (describing how witness testimony directly tied the defendant to the uncharged conspiracies where the witness heard defendant discussing plans to murder or assault at least ten individuals); *Rolett*, 151 F.3d at 789–791

---

roughly nine inches long. (Doc. 2181 at 5; *see also* Government's Rule 404(b) Notice at 6–8.)

(explaining that the enterprise leader testified that defendant was partaking in a series of uncharged thefts and burglaries for the benefit of his "chop-shop" business). Furthermore, Gray's prison assaults do not form part of a single criminal episode to justify the admission of this evidence. As explained in *Lillard*:

> Evidence of Lillard's theft of the cocaine was inextricably intertwined with the conspiracy charge. As we noted in *Williams*, "[t]he policies underlying [R]ule 404(b) are inapplicable when offenses committed as part of a single criminal episode become other acts simply because the defendant is indicted for less than all of his actions." *Id*. (internal quotation marks and citation omitted). Lillard stole the cocaine from the very shipment that provided the basis for his involvement in the conspiracy to possess and distribute cocaine. *See United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995). . . . Telephone conversations among Duenez, Dominguez, and Hooper discussing the missing eight bundles of cocaine all identify Lillard as the driver of the December shipment. Lillard's subsequent admissions to Hooper concerning the theft provide additional evidence of identity, but more importantly serve to establish another element of the conspiracy, namely Lillard's knowledge of the contents of the illegal December shipment.

354 F.3d at 854. Thus, Gray's two prior prison assaults have not been demonstrated to be inextricably intertwined with the AB enterprise nor are they sufficient to prove Gray's involvement in the AB.

Second, when seeking to admit evidence of "prior bad acts" that are not inextricably intertwined with the charged crime, the Court must apply the following four-pronged test: (1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that the defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged.[3] *Vizcarra-Martinez*, 66 F.3d at 1013 (citing *United States v. Mayans*, 17 F.3d 1174, 1181 (9th Cir. 1994)).

---

[3] In applying this test, the Ninth Circuit has emphasized that:

> "Extrinsic act evidence is not looked upon with favor." We have stated that "[o]ur reluctance to sanction the use of evidence of other crimes stems from the underlying premise of our criminal system, that the defendant must be tried for what he did, not for who he is." Thus, "guilt or innocence of the accused must be established by evidence relevant to the particular offense being tried, not by showing that the defendant has engaged in other acts of wrongdoing."

*Vizcarra-Martinez*, 66 F.3d at 1013–14 (citations omitted).

Here, the Government argues that the two prison assaults demonstrate modus operandi, common scheme or plan, and Defendant's knowledge of the enterprise. (Doc. 2181 at 9–10; *see also* Government's Rule 404(b) Notice at 6–7.) the Government argues that the way that Gray committed the prison assaults was unique to the AB enterprise because AB members often attack their victims in tandem and continue to attack until physically removed; Gray's 2020 assault of non-white prison members shows his involvement in the AB enterprise; and Gray's 2018 assault using a prison-made weapon shows his involvement in AB's scheme to use violence to instill fear in California prisons. (*See id.*)

After the application of the four-pronged test enumerated above, the Court concludes that evidence of Gray's two prior prison assaults is inadmissible character evidence of prior bad acts under Rule 404(b). The Court recognizes that such evidence is not too remote because the January 2020 assault occurred approximately eight months before the October 2020 murders. However, the main flaw in the Government's argument is the lack of evidence that Gray committed these two prison assaults *because of*, or *at the direction of*, the Aryan Brotherhood. Therefore, the Government's showing is insufficient to demonstrate that Gray committed the other act in question (e.g., the two murders), as these assaults do not prove Gray's involvement in the larger AB enterprise. *See Vizcarra-Martinez*, 66 F.3d at 1013. Without that, it is difficult to deduce any connection between these prison assaults and the murders in question because undoubtedly prisoners attack other prisoners with homemade weapons without involvement of the AB. Indeed, if this evidence were admitted, the jury members would be invited to conclude that Gray committed the murders because he has a character for violence. Consequently, the minimal probative value of the evidence is substantially outweighed by the undue prejudice under Rule 403. Thus, the Court **DENIES** admission of evidence regarding Gray's prior prison assaults.

In sum, the Defendant's motion in limine (Doc. 2121), is **DENIED in PART** and **GRANTED in PART**.

**B. Relevancy, Prejudice, & Character Evidence: Rules 401, 402, 403, 404(b) Issues**

Under the Federal Rule of Evidence 401, "[e]vidence is relevant if: (a) it has any tendency

to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence may still be inadmissible, however, if prohibited by another rule of evidence, the U.S Constitution, or a federal statute. Fed. R. Evid. 402. Relevant evidence may also be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

1. Eliciting Testimony That the AB is Racist and/or Harbors White Supremacist Beliefs as Irrelevant and Unduly Prejudicial (Doc. 2128)

Defendant moves to preclude the Government from introducing evidence or making argument that the Aryan Brotherhood is a racist organization which encourages white supremacist beliefs as irrelevant and unduly prejudicial. (Doc. 2128 at 1.) The Government counters that (1) the racist ideology behind the AB forms the rationale for why it targeted the victims; and (2) the enterprise's white-only membership framework, founding principles, and white-superiority belief system relates to Defendant's VICAR murder charges. (Doc. 2170.)

Defendant argues that the evidence is irrelevant because "[t]here is no claim that the crimes alleged against Mr. Gray were racially motivated, and the real or imagined attitudes of AB members are unrelated to the alleged racketeering activities." (*Id*. at 3.) He relies on *Dawson v. Delaware*, 503 U.S. 159, 166 (1992), for this proposition. (Doc. 2128 at 3.) However, in *Dawson*, the Supreme Court concluded that a stipulation[4] of the parties and evidence regarding defendant's membership in the AB "chapter" of the Delaware prison was irrelevant to defendant's *sentencing* proceeding. *Dawson*, 503 U.S. at 162, 164–68 (pertaining to sentencing in capital murder where the government sought to introduce evidence of defendant's AB membership as an aggravating factor to prove future dangerousness). The Court explained that such evidence was not tied in any way to the murder of defendant's victim, where both the defendant and the victim were white. *Id*. at 166 (citing *Barclay v. Florida*, 463 U.S. 939, 942–44, 949 (1983)). The Court further explained

[4] The stipulation read: "The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware." *Dawson*, 503 U.S. at 162.

that the stipulation, which only arguably presented the abstract racist beliefs of the AB Delaware Prison chapter, had no relevance to proving aggravating circumstances for sentencing (e.g., associational evidence of future dangerousness) because "the prosecution did not prove that the [AB] had committed any unlawful or violent acts, or had even endorsed such acts." *Dawson*, 503 U.S. at 166. And even if such abstract beliefs formed part of defendant's "character," such evidence violated defendant's first amendment rights and could not be seen as relevant "bad" character evidence to rebut any mitigating evidence. *Id*. at 167–68.

By contrast here, Defendant is charged with two counts of VICAR murder which requires proof that a criminal racketeering enterprise exists and that Defendant acted with the purpose of promoting his position in such enterprise. *Banks*, 514 F.3d at 964. Evidence of AB's white-race based ideology is relevant because it explains why codefendant Clement believed that the *white* victims owed the AB a tax on their fraudulent EDD earnings. (*See* Doc. 2170 at 4; Doc. 2181 at 7.) Namely, the AB rules dictate that, despite not being members of the AB, white criminals such as Roshanski must pay a portion of their fraudulent earnings to the AB. (Doc. 2181 at 7.) Roshanski was a white criminal engaged in EDD fraud and was therefore targeted by Clement, who ran the AB's fraudulent EDD operation, for failing to pay his fair share of taxes. (*See id*; Doc. 2170 at 4.) The Government further alleges that, as a result, Clement ordered Gray to kill Roshanski and Gray committed the act to gain favor with the AB and remain in good standing with them. (Doc. 2181 at 7–8.) As such, evidence of the AB's white-race command structure helps prove the existence of an enterprise and is probative to the "chain of events forming the context, motive, and set-up of the crime." *United States v. Mills*, 704 F.2d 1553, 1559 (11th Cir. 1983).

In *Mills*, the Eleventh Circuit affirmed the admission of similar evidence where defendant murdered a fellow inmate pursuant to an AB contract—ordered by an AB "commissioner" at another prison—because that fellow inmate had cheated the commissioner in a drug transaction. *Id*. at 1555, 1558–59 (affirming the admission of testimony on the organization, history, and activities of the AB, and a letter the defendant wrote which alluded to his participation in other AB crimes and reference to AB activities). "To make the crime comprehensible to a jury it was

necessary for the government to show how the [AB] functioned, that Mills was a member of the [AB], [and] that an affront to a fellow member might serve as an adequate motivation for [Defendant] to kill a person whom he barely knew. . . ." *Mills*, 704 F.2d at 1559. Similarly, here, the Government has alleged that Defendant committed murder on behalf of, or at the command of AB, as against victims targeted by the AB, "for purposes of . . . increasing position in the AB[] enterprise." (*See* Doc. 1970 at 11.) Thus, evidence of AB's race-based command structure is significant for proving the events leading up to the murder and Gray's potential motive for committing the crime, where AB targeted Roshanski and used Gray to carry out the criminal act. (*Id*.; Doc. 2170 at 4); *Mills*, 704 F.2d at 1559.

In sum, evidence regarding the AB's race-based command structure, the AB's control over members and associates from other white-only street gangs, Defendant's specific role in the enterprise, Defendant's motive in committing the crime, and background for why the victim was targeted by the AB is highly probative to the crime charged. *See Mills*, 704 F.2d at 1559 ("The evidence required to prove motive and the events leading to [the inmate victim's] murder was necessarily substantial because the Aryan Brotherhood is a covert organization within the prison system, a culture strange and foreign to a lay jury even in its most obvious aspects."); *see also United States v. Beasley*, 72 F.3d 1518, 1527–28 (11th Cir. 1996) ("The evidence regarding the religion was relevant, because religious teachings were used to justify, rationalize, and promote crime."). Likewise, the risk of unfair prejudice does not substantially outweigh the probative value of such evidence. *See Mills*, 704 F.2d at 1559 ("Against this backdrop, the evidence on the [AB] was not prejudicially cumulative.").

Defendant argues that reference to racial animus is irrelevant and unduly prejudicial because it would be inflammatory, trigger a visceral reaction from the jury, and lead them to decide the case based on an improper, often emotional, basis. (Doc. 2128 at 3.) The Court agrees. While "racially exclusionary policies can be relevant even where no race-based crime is at issue if 'it tend[s] to show the uniformity of the . . . enterprise," *United States v. Dencklau*, 160 F.4th 1046, 1052–53, 1059 (9th Cir. 2025), any reference to AB's racially exclusionary policies do not bear on the issues in this case and would be irrelevant under Rule 401. Instead, reference to AB's

race-based policies must be tied to the AB enterprise and racketeering activities. For instance, the AB's recruitment of white-only gang members, or the AB's expectation for white criminals to pay taxes on certain illegal activity is relevant and admissible. Nonetheless, such evidence cannot be excessively cumulative. As the Eleventh Circuit best explained:

> Because it was cumulative, the evidence of the whites-only policy had limited probative value. This limited probative value was . . . outweighed by the danger of unfair prejudice. The uneasy racial history of criminal law in the United States has yielded a simple rule-of-thumb: "There is no place in a criminal prosecution for gratuitous references to race, especially when a defendant's life hangs in balance . . . the Government . . . should have scrupulously avoided the possibility that the jury's verdict might be clouded by racial issues.

*United States v. Bowman*, 302 F.3d 1228, 1239–40 (11th Cir. 2002). Likewise, Defendant is not charged with a racially motivated crime, therefore cumulative evidence showing racial animus/ racist beliefs to prove AB's uniformity, in the presence of other equally probative evidence for that same purpose, will not be allowed under Rule 403.

Finally, Defendant argues that testimony regarding the alleged racist attitudes of AB members and evidence of the AB symbols such as Nazi and white supremacist iconography is irrelevant and unduly prejudicial. (Doc. 2128 at 3.) The Government argues that racism is relevant to proving the AB's status as an enterprise. (Doc. 2170 at 2.) While evidence that the AB subscribes to white supremacist beliefs and white-only policies is admissible for proving the existence of an enterprise, the Court concludes at this time and upon the current showing, that display of racist symbols and testimony regarding racist attitudes of individual AB members is needlessly cumulative and unduly prejudicial. *See Bowman*, 302 F.3d at 1239–40.

Such evidence is not probative because Defendant is not charged with a racially motivated crime. *Id.*; *cf. United v. Beasley*, 72 F.3d 1518, 1522, 1528 (11th Cir. 1996) (allowing evidence of the enterprise's leader's racist views, whose teachings were black supremacist and violently racist, as highly relevant where defendants were tried for killing or attempting to kill many white victims at the leader's direction to "chase white men, whom he referred to as 'white devils'"); *cf. United States v. Allen*, 341 F.3d 870, 875–76, 885–86 (9th Cir. 2003) (upholding the admission of photos of swastika tattoos, symbols of white supremacy, and Nazi-related literature as probative

of racial animus where defendants were charged with excluding and oppressing racial minorities from using a public park in violation of their federal civil rights under 18 U.S.C. §§ 241, 245(b)(2)(B)). Unless the Government makes the connection between Defendant's *own alleged racist views* as a *motive* for joining the AB, thereby committing murder to gain favor with the AB, such evidence is inadmissible. *See Allen*, 341 F.3d at 886.

In conclusion, evidence displaying the AB's white supremacist beliefs, white-only membership, and race-based policies is probative to Defendant's VICAR charge and not unduly prejudicial, so long as not needlessly cumulative. However, evidence of racism such as Nazi and white supremacist iconography, racially exclusionary policies, and racist attitudes of other AB members is inadmissible under Rule 403. Thus, the Defendant's motion in limine (Doc. 2128), are **DENIED in PART** and **GRANTED in PART**.

2. Exclusion of Two Idaho Jail Calls as Irrelevant and Unduly Prejudicial (Doc. 2126)

Defendant moves to exclude or to limit the admission of two Idaho jail calls as irrelevant and unduly prejudicial.[5] (Doc. 2126.) The first involves an audio-recorded call at Bingham County Jail on April 29, 2021, approximately seven months after the Lomita murders. (Doc. 2176 at 4.) The second involves a video-recorded call, also out of Bingham County Jail on July 16, 2021, less than ten months after the murders. (*Id*. at 5.) Both calls were made by Gray to a romantic partner named Julia. (Doc. 2126 at 4–5.) The audio call largely includes Gray complaining to Julia for cheating on him, referencing Gray's gang affiliations (e.g., Baby Blue Wrecking Crew), referencing Gray's fearsome reputation, and an admission by Gray that he is a "killer" and "killer of dogs." (*See* Exh. 102.) The video call largely consists of Gray's romantic overtures to Julia and complaints about Julia's desire to be with another man who is out of prison. (*See* Exh. 104.) In relevant part, Gray tells Julia that the other man she is seeing does not stand a chance against him: "No, his protection won't even protect him against me because I'm just as protected. They just say, 'You guys go ahead and hash it out.'" (*Id*. at 3, lines 20–22.)

[5] The parties have stipulated to the authenticity of both the audio and video call. (*See* Doc. 2140.) However, Defendant reserves his right to challenge the calls and transcripts on any additional ground, including foundation. (Doc. 2126 at 4 n.1.)

*a. Audio-Recorded Call Dated April 29, 2021*

Defendant argues that the audio-recorded jail call involves two people in a relationship discussing intimate issues of trust, commitment, and sexual loyalty. (Doc. 2126 at 4.) Defendant argues that the overall ambiguity in the conversation, use of vulgar language, reference to sexual acts, and reference to violence, would be confusing and offensive to a jury. (*Id.*) Defendant further argues that Gray blurting out that he is a "killer" who "killed dogs" was made without explanation and appeared to be an attempt to look tough. (*Id.*) According to Defendant, Gray's statement provided no link between his words and the Lomita murders, and that there is no reason to believe the words refer to the Lomita murders. (*Id.*) By contrast, the Government argues that the audio call is highly probative because Gray's statement that he is a "killer" was "likely a confession to the murders for which he has been arrested" and reference to his gang affiliations is probative to the existence of an enterprise of which he is part. (Doc. 2176 at 4.) The Court finds that the audio call is largely inadmissible except for the portions that refer to Gray's membership in the Baby Blue Wrecking Crew ("BBWC").

*i. Gray's Incriminating Statement*

First, the portion of the audio where Defendant states, "I'm a killer" should not be admitted because the risk of unfair prejudice and confusing or misleading the jury substantially outweighs the probative value. Fed. R. Evid. 403. The relevant portion of the audio reads as follows:

> GRAY: It happened. It happened. No, it's just . . . dude. <u>I'm a killer</u>.
> JULIA: You . . . don't . . . why the fuck would you say that on the phone? Like, why the fuck . . .
> GRAY: <u>Because I killed dogs</u>.
> JULIA: . . . did you say that on the fucking phone? Are you stupid?
> GRAY: <u>I kill dogs</u>.
> JULIA: Why the fuck would you say that? On the fuck . . .
> GRAY: Baby. Hello?
> JULIA: Just . . . you're careless as fuck, dude. Like, why the fuck would you say that on the phone?
> GRAY: Because you're fucking sick and you're wondering why the fuck people [U/I].
> JULIA: It doesn't matter. It doesn't matter.
> GRAY: There's a difference between people. You just don't realize it.

> JULIA: I get there's a difference between people, but, like, why the fuck would you say that on the motherfucking phone?
> GRAY: Because you're pissing me off and you fucking . . . it's like you fucking forget who I am, because I've been in jail and I bitch up to you all the time.

(Exh. 102 at 8, lines 8–26 (emphasis added).)

On the surface, when "read literally" and "out of context," this statement appears probative of the crime charged as an admission of guilt or a confession to the murders. *See U.S.A. v. Garcia-Zarate*, 419 F. Supp. 3d 1176, 1179 (N.D. Cal. 2020). However, given the overall context of the call, which largely involves Gray bragging to Julia about how tough he is and how everyone is afraid of him, the statement's "probative value is greatly diminished by the larger context." *Id*. at 1180. In *Garcia-Zarate*, the court found that admission of defendant's incriminating statement at his arraignment hearing, namely, that "he brought [t]he gun in his pants pocket to the pier," was unduly prejudicial and confusing in a case where defendant was charged with unlawful possession of a firearm. *Id*. at 1179–80. The court reasoned:

> In terms of probative value, the statement, if read literally and considered out of context, could easily be taken to constitute an admission that he brought [t]he gun in his pants pocket to the pier. However, when considered in the context of the question he was asked (namely, whether he understood the charges against him), the statement was more likely an artless attempt to describe what the government has accused him of doing. This understanding of his statement is supported by a review of the transcript of the state court trial—it is likely that, at the arraignment, Garcia-Zarate was attempting to parrot what he was repeatedly accused at trial of having done (that is, bringing the gun to the pier in his pants pocket). This likelihood becomes stronger after considering the police interrogation and the ABC interview of Garcia-Zarate. His responses to questions in those situations range from inarticulate to incomprehensible, suggesting that little can be learned by parsing his response to the judge's question at the arraignment.

*Id*. (emphasis added). The court explained that the government would have to provide context to introduce the incriminating statement, including statements made by defendant during his state trial proceeding and an ABC interview, which would be prejudicial to both sides and distracting to the jury. *Id*. at 1180 (finding, for instance, that reference to the related state trial proceeding, where defendant was ultimately acquitted of state homicide charges, would open the door to

speculation about what happened at that trial which would be prejudicial for the government).

Similarly, here, the larger context of the jail call involves Gray boasting about his toughness, "punking" another man out of his own room, threats of "jamming" up one of Julia's romantic interests, and Gray bragging about his fearsome reputation. (*See* Exh. 102 at 2–9.) Generally, this kind of evidence is inadmissible character evidence under Rule 404(a)(2). Gray also expresses frustration with Julia for cheating on him, (Exh. 102 at 2–9), which is entirely irrelevant to the crime charged under Rule 401. Hence, admitting the incriminating statement in this context would be unduly prejudicial and distracting to the jury. *See Garcia-Zarate*, 419 F. Supp. 3d at 1180. Additionally, the probative value of this statement is minimal. While the Government argues this statement serves as a confession to the crime charged, Gray makes no reference to the Lomita murders and instead follows up by saying he is a "killer of dogs." (Exh. 102 at 8.) Even if he is admitting to being a "killer", the conversation is ambiguous as to whether he is talking about the Lomita murders, other killings, reference to a general capacity to kill, or reference to his violent character. Consequently, Gray's incriminating statement "I'm a killer" is not intertwined with the crime charged.

In reaching this conclusion, the Court finds *United States v. Garnes*, 102 F.4th 628, 631, 635 (2d Cir. 2024) illustrative. In *Garnes*, the defendant was charged with threatening to assault and murder employees of the USPS and transmitting threats via interstate commerce in connection with a September 2022 phone call he had with the Department of Labor requesting unemployment benefits. *Id*. at 631. The Second Circuit allowed admission of five incriminating statements that defendant made during the phone call related to his prior criminal history, where he exaggerated his overall length of incarceration and number of prior felony convictions. *Id*. at 632, 635. The Court explained:

> [T]he statements at issue here were part of the *actus reus* of the crime. The statements were injected into the case by Garnes himself, as part of the very same conversations in which he made the threats. Their probative value was particularly strong, because a reasonable jury could find that they were powerful indications that Garnes's statements about shooting USPS and DOL personnel were, and were intended to be, true threats. The jury could find from those statements that Garnes emphasized, and indeed exaggerated, his character as a dangerous person in order to frighten those threatened by suggesting

> that he had the capacity to carry out his threats, and that he would not be deterred from carrying them out by the threat of punishment. Thus, the inference that Garnes was a violent person was not an unfair inference that one party sought to create in the minds of the jury about its adversary, but an impression that Garnes himself could be found to have sought to create in the minds of the victims.

*Id*. at 635. The challenged statements in *Garnes* not only formed part of the charged conduct but also proved an element of the crime. *Id*. Specifically, defendant's puffery regarding his dangerous character/ exaggeration regarding his criminal history showed an intent to frighten his victims and an understanding of the threatening nature of his statements. *Id*. at 633, 635. Conversely, Gray's incriminating statement is neither part of the charged conduct, nor proof that he committed the specific violent crime at issue. (*See* Exh. 102 at 8.) Instead, Gray's puffery to Julia regarding his dangerous character is wholly unrelated to the crime charged.

Similarly, though not exactly analogous, *Stewart* is also illustrative. *Stewart v. Oliver*, No. 2:21-cv-01490-APG-BNW, 2024 WL 1075410, at *1, 14–15 (D. Nev. Mar. 12, 2024). There, the court denied defendant's habeas petition in connection with his conviction for conspiracy to commit robbery, in part, because his counsel's failure to exclude certain jail calls was reasonable where such calls were probative of consciousness of guilt. *Id*. The court found that a reasonable attorney could conclude that objecting to such evidence was futile because the probative value was not substantially outweighed by the danger of unfair prejudice. *Id*. at *15. The Court explained that (1) defendant's jail call to someone requesting they call another person and say that "stuff" happened in his area; and (2) statements made that police did not have his fingerprints or a positive identification from the victim showed that he was attempting to warn co-conspirators, was probative of guilt, and was not unduly prejudicial. *Id*. at *14–15.

By contrast here, Defendant does not reference the crime charged, the victims in the case, or the Lomita murders at all. *Cf. Stewart*, 2024 WL 1075410, at *14 (explaining that during his jail calls, defendant discussed the very crimes for which he was incarcerated and charged and appeared to have referenced the victim in the robbery). Indeed, according to the parties' representations at the motion hearing, (*see* Doc. 2192), at the time of this call, Defendant was detained in Idaho in connection with an arrest or charge in Idaho, not in connection with these or

any murders. This further attenuates the link between this alleged "confession" and the crime charged. Though Julia's startled reaction to Gray's statement may be suggestive of guilt, (*see* Exh. 102 at 8), it is not necessarily indicative of Gray's guilt in connection with the two murders at issue. In sum, this Court cannot say that Gray's incriminating statement—made while arrested on other charges and while engaged in braggadocio with his romantic partner—tends to show "consciousness of guilt" in the present VICAR case. Therefore, the statement is inadmissible.

*ii. Gray's Reference to his Fearsome Reputation and Character for Violence*

Second, the portion of the audio where Gray alludes to his fearsome reputation, character for violence, possible intent to harm Julia or the men she cheats on him with, and Julia's request for Gray not to "do shit to anyone,"[6] is likewise inadmissible character evidence under Rule 404(a)(2). (*See* Exh. 102 at 10–20, lines 2–27.) While such evidence may be relevant, it is nonetheless inadmissible if prohibited under another rule of evidence. *See* Fed. R. Evid. 402. Moreover, the context of the statements significantly undermines that there is any true threat or malice in them. Rather, they seem to be a showing of bravado to a woman to whom he is attracted and is trying to win over.

If the Government intends to use such evidence to prove that the Defendant acted in conformity with his violent character, such evidence is inadmissible to prove that he committed the murder, unless Defendant first opens that door during his case-in-chief. *See* Fed. R. Evid. 404(a)(2)(A). The Government contends only that these references to Gray's reputation and violent nature are "probative of the crimes charged." (Doc. 2176 at 5.) The minimal probative value of this evidence appears at this time to be substantially outweighed by unfair prejudice under Fed. R. Evid. 403 and as improper character evidence used to prove Gray's propensity to commit murder. Furthermore, any reference to interpersonal conflicts Gray has with other men

[6] The Government argues that Julia asked Gray to promise her that he "won't shoot anyone." (Doc. 2176 at 5; *see also* Exh. 102, Audio Jail Call Transcript at 10, lines 24–25). However, the audio recording appears to say, "But you have to promise me you're not going to do shit to anyone." (*See* Exh. 101, Audio Jail Call Recording at 8:31–8:34.) In the event this portion of the audio becomes admissible at trial, the Court **RESERVES** ruling on the admission of this portion of the transcript stating "But you have to promise me you won't *shoot* anyone" to the extent it inaccurately represents the audio. (Exh. 102 at 10, lines 24–25.)

due to his romantic relationship with Julia and her infidelity is irrelevant to the crime charged. Fed. R. Evid. 401.

*iii. Gray's Reference to his Affiliation in BBWC*

Third, the portion of the audio referencing Gray's involvement in BBWC, another white-race-based gang, is admissible because it is central to the Prosecutor's theory in proving a criminal enterprise, which is an element of Defendant's VICAR murder charge. (*See* Exh. 102 at 5–6, lines 14–25.) Namely, that the AB is a criminal enterprise which uses other white gangs, such as BBWC, to carry out the AB's business on the streets and that new AB members are often drawn from their ranks. (Doc. 2176 at 5.) The context of the audio includes Gray swearing to Julia that he "punked" an individual named Cody "out of his own room," and when Julia does not believe him, Gray says: "that's on my white skin [U/I], Baby Blue Wrecking Crew." (Exh. 102 at 6, lines 1–3.) Gray's reference to his association with BBWC is probative toward proving that Gray was part of a white-race-based gang, which relates to the Government's theory that AB formed an enterprise with other white street gangs. *See United States v. Fernandez*, 388 F.3d 1199, 1246 (9th Cir. 2004) (upholding the admission of defendant's tattoos as not unduly prejudicial because it "tended to prove gang membership, which the government alleged was a precursor to membership in the Mexican Mafia" in a RICO charge). Thus, such evidence is admissible and not unduly prejudicial under Rule 403.[7] Nor is admission of such evidence excluded under the hearsay rules of evidence because it is a party opponent statement under Rule 801(d)(2).

*b. Video-Recorded Call Dated July 16, 2021*

Defendant argues that the video-recorded jail call is irrelevant and unduly prejudicial as much of the call is sexually suggestive with no mention to the Lomita murders. (Doc. 2126 at 5.) The Government argues that the video call is relevant because it "discusses gang dynamics," "speaks to Gray's association with gangs that the government will show are related to the AB enterprise," and that Gray is aware of the enterprise's "rules and levels of authority." (Doc. 2176

[7] By that same token, Julia's remark that Gray is not actually friends with Cody because Gray is "white" and Cody is "Southside" (*see* Exh. 102 at 21, lines 3–27) is relevant to proving Gray's white-gang affiliation. However, the Government presents no argument on why this statement falls within a hearsay exception when offered to prove the truth of the matter asserted. (*See* Doc. 2176 at 5.) As such the Court **RESERVES** ruling on this issue.

at 5–6.) Specifically, the Government seeks to admit the portion of the video where Gray says, in reference to another man, "his protection won't even protect him against me because I'm just as protected. They just say, 'You guys go ahead and hash it out.'" (*Id*. at 6; *see* Exh. 104 at 3, lines 20–22 (emphasis added).) Despite it being unclear who Gray is referring to, the Government argues that these statements tend to show gang dynamics and Gray's participation in the AB enterprise. (Doc. 2176 at 5–6.) The Court agrees.

Though Julia's comments are largely unintelligible during this portion of the conversation, (*see* Exh. 104 at 2–3, lines 3–22; *see also* Exh. 103), it is clear Gray is discussing an interpersonal conflict he has with another man due to his relationship with Julia. In doing so, he references his "protection" and indicates "they"—referring, apparently, to the gang or gangs to which he and his romantic rival are affiliated—will not intervene in this interpersonal conflict but will let them "hash it out." (Exh. 104 at 3, lines 20–22.) Though the conversation is vague, Gray's reference to his "protection" and his rival's "protection," suggests that Gray is associated with a prison gang or other hierarchical network. Because the defense does not concede that Gray is affiliated with any gang, let alone an AB "feeder" gang, the evidence is relevant and admissible to establish the element of the crimes—that Gray committed murder to gain admission to, or improve his standing with, the AB gang. Relevancy is a low threshold, and though the rest of the video is irrelevant, any undue prejudice under Rule 403 is mitigated by admitting only the relevant part of the video and transcript. (*See* Exh. 103 at 0:00–3:20; Exh. 104 at 2–3); Fed. R. Evid. 401, 403; *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) ("Relevancy simply requires that the evidence logically advance a material aspect of the party's case.") (quotations and citations omitted). Finally, any such statements by the Defendant are admissible hearsay as a statement of a party opponent under Rule 801(d)(2).

In conclusion, relevant portions of the audio and video recorded calls are admissible.[8] Thus, the motion is **DENIED in PART**, **GRANTED in PART** and **RESERVED in PART**

[8] The Court will allow admission of relevant portions of the audio/ video to the extent necessary to provide context for the jury. The Government has yet to identify those portions. (*See* Doc. 2176 at 6–7.) **At least 7 days before trial,** the Government **SHALL** produce the portions of these calls to the defense. The Court expects that the parties will work out any disputes over these clips, consistent with the Court's order here, or the parties **SHALL** bring the dispute to the Court **BEFORE** trial.

Defendant's motion in limine. (Doc. 2126.)

3. Exclusion of Evidence Found in Defendant's Jail Cell, Defendant's Tattoos, and Defendant's Gang Affiliation as Irrelevant and Unduly Prejudicial (Doc. 2123)

*a. Evidence Discovered During November 1, 2023, Fresno County Jail Search of Gray's Jail Cell*

On November 1, 2023, members of the Fresno County Sherrif's Department searched the jail cells belonging to Gray and to his codefendants. (Doc. 2123 at 4.) They discovered (1) medication/ medical supplies in codefendants' Clement and Johnson's cells; (2) contraband in codefendant Perkin's cell; and (3) a hidden shank in a false compartment at the bottom of a file folder in Gray's cell. (*Id.*; *see also* Doc. 1649 at 1–2.) Defendant argues that evidence uncovered from the 2023 jail searches is irrelevant and manifestly prejudicial. (Doc. 2123 at 4.) According to Defendant, because he is not charged with participating in a RICO conspiracy, any such evidence is irrelevant to his VICAR murder charge. (*Id*. at 4 n.1.)

The Government advocates only for the admission of items found in Gray's cell. (*See* Doc. 2167 at 1–3.) The Government argues that though Defendant is not charged with Count One (e.g., RICO conspiracy), he is charged with Counts Two and Three (e.g., VICAR murder), which incorporate by reference the first sixteen paragraphs of Count One. (Doc. 2167 at 2; *see also* Doc. 1970 at 11.) Those sixteen paragraphs set forth the structure; method and means, including murders and assaults; and purposes of the AB, which involves using "threats, assault, obstruction of justice, robbery, extortion, and murder." (Doc. 1970 at 1–5.) According to the Government, the possession of a hidden shank while incarcerated is probative of Gray's involvement with AB, his motive for committing the alleged murders, and further shows the existence of an enterprise. (Doc. 2167 at 3 (citing *United States v. Rolett*, 151 F.3d 787, 790 (8th Cir. 1998).)

The Government is entitled to introduce evidence regarding the existence of a racketeering enterprise because that is an element of Defendant's VICAR murder charge. "[W]here the evidence the government seeks to introduce is directly related to, or inextricably intertwined with, the crime charged in the indictment" it is admissible and not barred by 404(b)

prohibition against evidence of prior bad acts. *Lillard*, 354 F.3d at 854. However, for the same reasons discussed above related to the prison attacks, and contrary to the Government's assertion, possessing a hidden weapon while in custody alone does not establish the existence of a racketeering enterprise. (Doc. 2167 at 3.)

There is no information as to how Gray obtained that weapon, how Gray intended to use that weapon, whether Gray in fact used that weapon to advance an AB purpose through "intimidation, violence, threats, assault." (Doc. 1970 at 4, ¶ 14(c).) Furthermore, the weapon was found three years after the Lomita murders took place, which further attenuates the link between this evidence and Gray's involvement in the criminal enterprise. Even if the Government introduces testimony that AB members routinely conduct stabbings in prison and that Gray was seeking to prove his worth by committing violence, (Doc. 2167 at 3), without specific evidence tying Gray to these kinds of AB stabbings, the discovery of Gray's hidden shank is an inadmissible prior bad act under Rule 404(b). *Cf. Rolett*, 151 F.3d at 789–791 (finding that evidence of defendant's prior bad acts—presented through the ringleader's testimony that defendant had burglarized homes, stolen goods, and stolen trucks in contribution to the enterprise's "chop-shop" business—was intrinsic evidence of defendant's involvement in the enterprise). As such the Court **GRANTS** Defendant's request to exclude the weapon found in Gray's prison cell on November 1, 2023.

*b. Evidence of Gray's Tattoos*

The Government seeks to introduce at least three images encompassing four of Gray's tattoos. (Doc. 2167 at 2; Exh. 8; Exh. 9; Exh. 10.) The first image captures Gray's chest and stomach with the words "Lomita" tattooed across his upper stomach. (Exh. 8.) The second image captures Gray's back with the words "South Bay" tattooed across his upper back and "Peckerwood" tattooed across his lower back. (Exh. 9.) The third image captures a close-up of Gray's neck with what appears to be large letters spelling "CREW." (Exh. 10.) Defendant argues that admission of such images is unfairly prejudicial because his tattoos are provocative and will suggest he has a hostile, criminal disposition. (Doc. 2123 at 4.)

The Court disagrees in part. Pictures of gang tattoos are routinely admitted as evidence

probative of gang membership, ideology, and affiliation. (Doc. 2167 at 4); *see*, *e.g.*, *Fernandez*, 388 F.3d at 1246 (explaining that the district court's admission of gang-related tattoos was not unfairly prejudicial where they were relevant to the charges in the indictment and tended to prove gang membership, which the government alleged was a precursor to membership in the Mexican Mafia). Central to the Government's theory in this case is that AB, in conjunction with other white-race based gangs, carried out AB's criminal racketeering activities. (*See* Doc. 2167 at 5.)

Therefore, Gray's gang association in a white-race gang—inferred through his three tattoos stating "Peckerwood," "CREW," and "South Bay"—is central to the VICAR charge. Peckerwood is a white-race based gang located in the Los Angeles area, including areas such as South Bay. Further, according to the Government's arguments at the motion hearing, (*see* Doc. 2191), expert testimony will establish that "crew" refers to the Baby Blue Wrecking Crew, another white-race gang from the Los Angeles area. Thus, these three tattoos raise an inference that Gray was part of a white-race gang from Los Angeles and decide what weight to give such evidence. However, evidence of Gray's "Lomita" tattoo is inadmissible as and unduly prejudicial. Fed. R. Evid. 403. The other three tattoos suffice for establishing Gray's gang affiliation. The relevance of the "Lomita" tattoo to establish that Gray grew up in the same city where the murders took place is unduly prejudicial and minimally probative. As to the exclusion of the tattoos, the motion is **DENIED in PART** and **GRANT in PART**.

*c. Evidence of Gray's Involvement in the Baby Blue Wrecking Crew Gang*

Similarly, the Government seeks to introduce evidence of Gray's involvement in BBWC. As explained above, Courts routinely admit evidence of gang affiliation when relevant to the crime charged. *See*, *e.g.*, *Fernandez*, 388 F.3d at 1246. Here, the government anticipates testimony that BBWC is a criminal street gang, along with other gangs such as Public Enemy Number 1 ("PEN1") falls under the authority of the AB prison gang. (Doc. 2167 at 5.) Such evidence is central to the VICAR murder charge in showing the existence of a criminal enterprise and Defendant's role in such enterprise. 18 U.S.C. § 1959(a)(1). Thus, the Defendant's request to exclude admission of Gray's reference to BBWC is **DENIED**.

In sum, the Defendant's motion in limine (Doc. 2123) is **GRANTED in PART** and

**DENIED in PART.**

4. Exclusion of Evidence of Seized During the Arrest as Irrelevant and Unduly Prejudicial (Doc. 2122)

Defendant argues that evidence of firearms, drugs, and ammunition found on his person, hotel room, and his vehicle at the time of his arrest on December 10, 2020, are unconnected to the October 2020 murders, irrelevant, and unduly prejudicial.[9] (*See* Docs. 1119, 1202, 1245, 2122, 2179.) This Court briefly summarizes the facts relevant to this motion in limine. On December 10, 2020, Los Angeles County Sheriff's Department investigators secured a *Ramey* warrant for Gray's arrest for the murders of Roshanski and Magomedgadzhiev. (Doc. 1119-1 at 2–8; Doc. 2179 at 2) After law enforcement received a report that Justin Gray and his friend Justin Free were staying at La Quinta Inn, in Ontario, California, officers arrested them. (Doc. 1119-1 at 2.) Officers encountered both men in the parking lot of the hotel and took Gray and Free into custody. (*Id*.) On Gray's person, officers found a KAHR Arms Model P45 .45 caliber handgun, a clear bag of a substance resembling methamphetamine, and a navy-blue mobile telephone. (*Id*. at 2, 4.) On Free's person, officers found a Polymer 80 Model PF40C 9 mm handgun. (*Id*. at 2.)

Officers also obtained a search warrant for the hotel room, which they accessed with Gray's key card and found additional items. (Doc. 1119-1 at 3.) In the bedroom of the hotel room, officers located a black backpack. (*Id*.) Inside the backpack, there was paperwork belonging to Free, sixteen loose rounds of live 5.56/.223 caliber ammunition (used in AR-style firearms), a working digital scale, a box of plastic fold top sandwich bags, and USB digital memory sticks. (*Id*.) In the living room of the hotel room, officers located a black rifle bag which contained a box of 9 mm ammunition, a drum magazine, two thirty-round magazines for 5.56 caliber ammunition

[9] The Court notes that Defendant initially filed this as a Motion to Suppress on June 13, 2024, (Doc. 1119), which was fully briefed, (Docs. 1202, 1245), but that motion remained under submission as of December 1, 2025. (*See* Doc. 2048.) Considering the continuance of trial to August 2026, this Court terminated that motion without prejudice and allowed Defendant to re-notice it as a motion in limine in accordance with the trial motions schedule. (*Id*.) Thus, the Court decides the motion in limine on the entirety of the briefing. (Docs. 1119, 1202, 1245, 2122, 2179.) Importantly, Defendant does not contest the search warrant or raise a Fourth Amendment constitutional challenge. (*See* Docs. 1119, 2122.) Rather, defendant only argues that such evidence is inadmissible under Fed. R. Evid. 403 and 404(b). (Doc. 1119 at 5.) Therefore, Defendant's challenge regarding the admission of this evidence is properly raised through a motion in limine.

(loaded), and two AR 15 style rifles. (*Id*. at 4; *see also* Doc. 2179 at 3.)

As for the evidence recited above, the Government has not yet identified what it intends to use at trial. (*See* Doc. 2179 at 5 ("The answer to how that evidence may be (or may become) relevant, and therefore admissible, will come into focus in the coming weeks as this case moves toward trial, but it is not ready for determination now, and thus exclusion is not warranted.").) However, the Government nonetheless argues that because Gray is charged with VICAR murder, the Government is free to admit such evidence as probative of an enterprise and its racketeering activity. (*Id*. at 4–7.) This is only true if the Government sufficiently connects this proffered evidence to Gray's alleged involvement in the larger AB enterprise, which it has not yet done.[10] *Vizcarra-Martinez*, 66 F.3d at 1013 (requiring "sufficient contextual or substantive connection" to the alleged crime to justify admission of prior bad act evidence).

As explained throughout this order, "where the evidence the government seeks to introduce is directly related to, or inextricably intertwined with, the crime charged in the indictment" it is admissible and not barred by 404(b)'s prohibition against evidence of prior bad acts. *Lillard*, 354 F.3d at 854. Here, the indictment charges Gray with VICAR murder, (Doc. 1970 at 11), which requires the Government to prove an enterprise engaged in racketeering activities and Gray's participation in the enterprise. *See Vasquez-Velasco*, 15 F.3d at 842. The indictment specifically enumerates "racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1), 1961(1)," "acts involving robbery . . . [under] California Penal Code" "drug trafficking in violation of 21 U.S.C. §§ 841, 843, and 846." (Doc. 1970 at 11, ¶ 2.) The evidence recovered

---

[10] Defendant largely relies on *McKinney v. Rees*, 993 F.2d 1378, 1381–85 (9th Cir. 1993) and *Walker v. United States*, 490 F.2d 683, 684–85 (8th Cir. 1974) to argue that such evidence is inadmissible character evidence under Rule 404(b). (Doc. 1119 at 5–6.) However, neither *McKinney* nor *Walker* dealt with a VICAR charge under 18 U.S.C. § 1959(a). *Cf. McKinney*, 993 F.2d at 1381–82. 1386 (finding prejudicial error in a first-degree murder case pursuant to Cal. Pen. Code § 187 involving a throat-slitting homicide where the district court allowed evidence of defendant's knife collection and past knives, which were unrelated to the crime, because it constituted inadmissible propensity evidence under Rule 404(b)); *cf. Walker*, 490 F.2d at 683, 684–85 (finding prejudicial error in an armed bank robbery case pursuant to 18 U.S.C. § 2113(d) where the district court allowed evidence of defendant's pistol seized when arrested, but that weapon was not the one used in the robbery). Under 18 U.S.C. § 1959(a), the Government must prove the existence of an enterprise engaged in racketeering activity. To the extent the evidence recovered at the time of Gray's arrest serves such purpose, it may be admissible despite Rule 404(b)'s bar against propensity evidence. *See Lillard*, 354 F.3d at 854.

during Gray's arrest includes numerous firearms, a small quantity of drugs, several rounds of live ammunition, and drug paraphernalia. (Doc. 1119-1 at 2–8.) This evidence is probative as it may raise an inference of racketeering activity and Gray's involvement in it. (*See id.*); *United States v. Butcher*, 926 F.2d 811, 816 (9th Cir. 1991) ("Firearms are known 'tools of the trade' of narcotics dealing because of the dangers inherent in that line of work.") (citations omitted).

The Court notes, however, that the discovery regarding a personal-use amount of methamphetamine and several weapons/ ammunition at the time of Gray's arrest is not necessarily "inextricably intertwined" to the underlying offense. As the Ninth Circuit best explained:

> [T]he evidence in this case does not fall within either of these exceptions [to Fed. R. Evid. 404(b)(1)'s rule prohibiting the admission of other crimes/ bad acts]. Coincidence in time is insufficient. The mere fact that a defendant is in possession of a small amount of a prohibited narcotic substance at the time he commits a crime is not enough to support the introduction of the evidence of drug usage. <u>There must be a sufficient contextual or substantive connection between the proffered evidence and the alleged crime to justify exempting the evidence from the strictures of Rule 404(b)</u>.
>
> Here, there was no such relationship. <u>First, the defendant's personal use of methamphetamine was, unquestionably, not a part of the transaction with which he was charged</u>—possession of hydriodic acid with knowledge that it would be used to manufacture methamphetamine. <u>The prosecution presented absolutely no evidence that the methamphetamine in question was obtained from a member of the conspiracy or that Vizcarra-Martinez had been involved in its manufacture or distribution</u>. Second, it is clear that the prosecution would encounter little difficulty in presenting the evidence relevant to its case against the defendant—his possession of hydriodic acid and the circumstances surrounding the commission of that crime—without offering into evidence the personal-use amount of methamphetamine the police discovered in the defendant's pocket upon arrest. <u>The methamphetamine found in the defendant's pocket had nothing to do with the incidents leading to the search, nor did it have any bearing upon the commission of the crime</u>. Thus, we reject the government's contention that the contested evidence was so inextricably intertwined with the crime as to fall outside the scope of Rule 404(b).

*Vizcarra-Martinez*, 66 F.3d at 1012–13 (emphasis added) (reviewing the admission of evidence in a case where defendant was indicted and convicted, in relevant part, of conspiracy to wrongfully possess a listed chemical having reasonable cause to believe that it would be used to manufacture methamphetamine in violation of 21 U.S.C. §§ 841, 802, and 846).

At this time and upon the current showing, the Government fails to explain how Gray's possession of these weapons and small quantity of methamphetamine (or even Justin Free's possession of such items) relates to the larger AB enterprise. (*See* Doc. 2179.) The Government further fails to show how, despite such evidence constituting "prior bad acts" under Rule 404(b)(1), it is nonetheless admissible for another purpose. (*Id.*); *see Vizcarra-Martinez*, 66 F.3d at 1013–16 (applying a four-pronged test and finding that the small quantity of methamphetamine on defendant at the time of his arrest did not tend to prove requisite knowledge of the conspiracy or the criminal act for which he was charged); *see also* Fed. R. Evid. 404(b)(2) ("This evidence may be admissible for . . . proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."). As such, the Defendant's motion in limine to exclude such evidence is **GRANTED**.[11] (Docs. 1119, 2122.)

**C. Hearsay: Rule 801**

1. <u>Designation or Exclusion of Co-Conspirator Statements under Rule 801(d)(2)(E) (Doc. 2138)</u>

Defendant moves for an order compelling the Government to designate with reasonable specificity the actual statements the Government intends to offer under Rule 801(d)(2)(E) or alternatively exclude the admission of any such co-conspirator statement. (Doc. 2138 at 2.) According to Defendant, on June 10, 2026, the Government produced a list of nineteen discovery items consisting of a total of over 500 pages but failed to identify specific statements in accordance with this Court's scheduling order. (*Id*. at 3; *see also* Doc. 2035 at 2.) By contrast, the Government believes it has complied with the Court's scheduling order. (Doc. 2172 at 1–2.) Specifically, it has identified not only the Bates number of the relevant documents but also identified the potential witness to whom the document relates. (*Id.*) This Courts scheduling order requires the production of "[s]tatements the government intends to offer under Fed. R. Evid. 801(d)(2)(E)." (Doc. 2035 at 2.)

---

[11] While Gray challenges the admission of "firearms, drugs, ammunition, and *all the items* seized" (Doc. 2122 at 5) during the December 2020 arrest, he fails to raise specific arguments as to the cell data derived from his navy-blue phone also recovered that day. (*See* Docs. 1119, 2122.) To the extent Gray seeks to challenge the admission of such data, the Court **RESERVES** a ruling on this issue.

Defendant argues that under Rule 801(d)(2)(E), the proponent must show: (1) that there was a conspiracy; (2) the defendant and declarant were participants to the conspiracy; and (3) the statement was made by the declarant during and in furtherance of the conspiracy. (Doc. 2138 at 4.) As such, Defendant asks for an order requiring the Government to produce these three items for every potential co-conspirator statement. (*Id.* at 5.) According to Defendant, because Gray is not charged with RICO conspiracy, it is difficult to ascertain what conspiracy is being asserted. (*Id.* at 4 n.2.)

First, the Court agrees with the Government that co-conspirator statements under Rule 801(d)(2)(E) is not limited to a conspiracy charged within an indictment but rather any joint venture so long as there is sufficient evidence of concerted action. *United States v. Manning*, 56 F.3d 1188, 1197 (9th Cir. 1995) ("A coconspirator's statement is admissible upon proof that it was made in furtherance of a conspiracy, notwithstanding the fact that the indictment does not contain a conspiracy count. The question is merely whether there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture."). Second, there is no legal requirement for the Government to proffer every potential co-conspirator statement it seeks to admit in advance of trial. As the Supreme Court in *Ritchie* best explained:

> <u>The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony</u>. Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses. In short, the Confrontation Clause only guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Pennsylvania v. Ritchie*, 480 U.S. 39, 53 (1987) (emphasis added). The Court further acknowledges that the Government must make a threshold showing under Rule 801(d)(2)(E) *before* the admission of the co-conspirator's statement in trial, however any such showing will be made in due course and outside the presence of the jury.

Third, the Court finds that the Government adequately complied with this Court's scheduling order, as it sufficiently identified potential co-conspirator statements to reasonably allow Defendant to prepare for trial. The Government produced the relevant document, the name

of the declarant witness, and identified the BATES stamp/ page number where the statement may be found. That is sufficient. As such, the Defendant's motion for an order requiring designation of Rule 801(d)(2)(E) statements (Doc. 2138) is **DENIED**.

2. Motion to Exclude Confidential Informant's Hearsay Statement as a Violation of the Sixth Amendment Confrontation Clause (Doc. 2125)

Defendant moves to exclude the statement of a confidential informant[12] used in support of a search warrant application dated November 2020, as inadmissible hearsay and a violation of the Sixth Amendment Confrontation Clause. (Doc. 2125 at 1; *see also* Doc. 1120-1 at 9.) The Government filed an opposition indicating that it "does not intend to elicit the contents of [such] statements on direct examination at this stage." (Doc. 2168 at 1–2.) However, the Government reserves its right to admit such statements if it becomes relevant to do so during trial. (*Id.*) As to this motion, the ruling is **RESERVED**. (Doc. 2125.)

### D. Lay and Expert Opinion Issues

The Court next turns to Gray's motions to limit or exclude the testimony of several of the Government's proposed expert witnesses, including Benjamin Mendoza (Doc. 2132), Jennifer Moore (Doc. 2134), Seargent Steven Slimp (Doc. 2131), and Special Agent Brendon Diggle.[13] (Doc. 2174.) Gray also seeks to exclude impermissible dual capacity witnesses. (Doc. 2127.)

1. Legal Standard

*a. Expert Opinion Testimony*

---

[12] Specifically, on or around November 10, 2020, the confidential informant told a LAPD narcotics officer that he/she was recently at a friend's apartment in Long Beach, when he/she overheard Gray talking to two unknown males about how he "got those two Russian guys" in Lomita. (Doc. 1120-1 at 9.) The informant also said that Gray's motive for the murder was that Gray sought to be made a member of the AB by killing the two victims. (*Id.*) That LAPD officer then relayed the information to the LASD officer Aguilera, who prepared the search warrant application. (*Id.*)

[13] Gray claims that for multiple of its expert witnesses, the Government failed to provide certain required disclosures pursuant to Fed. R. Crim. P. 16(a)(1)(G). (Doc. 2134 at 6; Doc. 2135 at 5.) Federal Rule of Criminal Procedure 16(a)(1)(G) requires disclosure of the opinions and qualifications of any expert witnesses, including: "(i) a complete statement of all opinions that the government will elicit from the witness in its case in-chief . . . ; (ii) the bases and reasons for them; (iii) the witness's qualifications, including a list of all publications authored in the previous 10 years; and (iv) a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition." The Court finds that the Government complied with its Rule 16 obligations for all expert witnesses at issue through both its initial and supplemental disclosures.

Rule 702 allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to give opinion testimony if the expert witness has "specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993).

After determining the witness is qualified to offer expert testimony within the meaning of Rule 702, the district court is tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quoting *Daubert*, 509 U.S. at 597.) "To satisfy its gatekeeping duty under *Daubert*, the court must make an explicit reliability finding." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1190 (9th Cir. 2019) (quotations omitted). The district court's gatekeeping can be performed through numerous procedures – such as motion in limine briefing and oral argument, voir dire, and cross-examination at trial. *See*, *e.g.*, *United States v. Calderon-Segura*, 512 F.3d 1104, 1108–10 (9th Cir. 2008).

The Supreme Court has provided a non-exclusive list of factors that weigh into a trial court's reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness's method is generally accepted as reliable in the relevant medical and scientific community. *Daubert*, 509 U.S. at 593–94. However, it is ultimately the Government's burden to "establish the reliability of the principles and methods employed" by the expert witness. *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002).

*b. Lay opinion testimony*

Under Federal Rule of Evidence 701, a witness who is not testifying as an expert may offer testimony in the form of an opinion if it is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Under Rule 701, a witness "may not 'testify based on speculation, rely on hearsay, or interpret unambiguous, clear statements.'" *United States v. Perez*, 962 F.3d 420, 435 (9th Cir.

2020) (citations omitted).

2. Motion to Preclude Dual Capacity Witnesses, Expert Testimony by Lay Witnesses, and Unnoticed Expert Opinions (Doc. 2127)

First, Gray seeks to preclude dual capacity witnesses, expert testimony by lay witnesses and unnoticed expert opinions. (Doc. 2127 at 1.) Specifically, Gray seeks to prohibit the Government's lay cooperating witnesses and any other witnesses not noticed as experts under Rule 16(a)(1)(G) from offering opinion testimony about the "institutional and internal operations of the AB." (*Id.*) The Government opposes the motion. (Doc. 2169.)

Gray argues Rule 701 prohibits any attempt by the Government to elicit testimony from a lay witness regarding "the Aryan Brotherhood's organization structure, hierarchy, rules, operation, codes of conduct, disciplinary practices, distinctive use of violence, fear or intimidation, or the meaning of related symbols, gestures, or coded language," given that such opinions about institutional behavior requires specialized knowledge pursuant to Rule 702.[14] (Doc. 2127 at 3–4.) Gray predominantly relies on Ninth Circuit precedent concerning law enforcement officers testifying as both gang experts and as percipient witnesses to the events in the investigation. (Doc. 2127 at 4, citing *United States v. Vera*, 770 F.3d 1232, 1241–43 (9th Cir. 2014) and *United States v. Holguin*, 51 F.4th 841, 855–56 (9th Cir. 2022).)

To the extent that Gray's concerns about dual capacity witnesses implicate any of the Government's expert witnesses—specifically gang experts—this Court has addressed this issue in a previous order on motions *in limine* in the trial of his co-defendants. (Doc. 1673 at 8–16.) The Court adopts similar reasoning here and will permit the Government to call such witnesses subject to certain guardrails. First, the Government **SHALL** take steps to prevent the jury from being presented with testimony that blurs the distinction between that of an expert and that of a percipient witness. This is best accomplished by articulating the line between lay and expert

[14] Gray cites to the Government's May 26, 2026, Notice of Intent to Introduce Evidence Potentially Under Rule 404(b), which indicates that "cooperating witnesses" will testify regarding: (1) the AB's method of carrying out violent crimes outside of the prison through fear; (2) the AB's "distinctive mode of committing prison assaults"; and (3) how the "AB enterprise uses violence and assaults to preserve, protect, and expand its powers within the California prison system." (Doc. 2127 at 3, citing 404(b) Notice, at 2, 5, 6.)

testimony for the jury *before* they hear it. *See United States v. Freeman*, 498 F.3d 893, 904 (9th Cir. 2007) ("If jurors are aware of the witness's dual roles, the risk of error in these types of trials is reduced."). Second, the Government **SHALL** give advance notice to the Court and opposing counsel, outside the presence of the jury, if it anticipates that a proffered expert will offer lay opinions or that a lay witness will offer opinions that are properly the subject of expert testimony, to ensure a proper foundation is laid and prejudice is mitigated.[15] Finally, the Government **SHALL** provide a jury instruction properly explaining the dual capacity witnesses.

Notwithstanding Gray's references to *Vera* and *Holguin*, his principal request is to preclude the Government's cooperating lay witnesses, presumably members or associates of the AB, to testify about certain aspects of the AB enterprise mentioned previously. In making such an argument, Gray does not confront the fact that lay witnesses may offer opinion testimony when that testimony is "rationally based" on the witness's perception and not on "scientific, technical, or other specialized knowledge." Fed R. Evid. 602, 701. "In presenting lay opinions, the personal knowledge requirement may be met if the witness can demonstrate firsthand knowledge or observation." *United States v. Lopez*, 762 F.3d 852, 864 (9th Cir. 2014). As to the issue of cooperating witness testimony on gang structure and tactics specifically, the Government's reference to *United States v. Garcia*, 2025 WL 314126, at *1 (9th Cir. Jan. 28, 2025), *cert. denied*, 146 S. Ct. 1459 (2026) proves informative.

In *Garcia*, the Ninth Circuit addressed an appeal of two defendants' conspiracy convictions under 18 U.S.C. §§ 1962(d) (RICO conspiracy) and 1959(a) (conspiracy to commit murder and assault with a dangerous weapon in aid of racketeering). *See* 2025 WL 314126 at *1. One of the issues on appeal was the testimony of three cooperating lay witnesses who based their testimony at trial partially on education they had received from Nuestra Familia, a Northern California–based prison gang and criminal organization. *Id*. According to the cooperators' testimony, "[e]ach member of Nuestra Familia housed in Monterey County Jail was educated about gang rules and practices, including which rule violations required the 'removal' of

[15] Likewise, if Gray seeks lay and expert opinions from a single witness, that party **SHALL** comply to the same extent as the Government.

offending members, the chain of command for removals, and how to conduct removals." *Id*. The Ninth Circuit rejected the appellants' argument that the three cooperator witnesses were improper undesignated experts, holding instead that each witnesses' testimony was rationally based on his perception of events within Monterey County Jail and that the basic education on gang structure and tactics under the circumstances did not qualify as "specialized knowledge" within the meaning of Rule 701 but rather was based on the witnesses' personal experiences. *Id*. at *5.

Though the Government here has not proffered evidence that its cooperating witnesses were formally "educated" on AB enterprises rules and practices in a similar manner as the cooperators in *Garcia*, the Court finds *Garcia*'s reasoning applicable to the present case. In the January 2025, trial of Gray's co-defendants, former associates of the AB testified to their perception of the AB's "position" on certain topics, such as speaking with law enforcement, lying, disobeying orders, or disrespecting other AB members. (*See* Doc. 1786 at 117–118.) The Court finds that not only is such testimony proper lay testimony under Rule 701, but it is also directly relevant to assisting the jury in determining the existence of the AB enterprise and its rules and practices. Thus, the Government's cooperating witnesses will be permitted to testify as to AB's organization structure, hierarchy, rules, operation, codes of conduct, disciplinary practices, distinctive use of violence, fear or intimidation, or the meaning of related symbols, gestures, or coded language to the extent such testimony is a reflection of the witnesses' personal experiences. Thus, for foregoing reasons, the motion (Doc. 2127), is **DENIED**.

3. Motion to Preclude or Limit Testimony of Gang Expert Steven Slimp (Doc. 2131)

Gray moves to exclude the testimony of proposed Government gang expert Sergeant Steven Slimp. (Doc. 2131.) The Government no longer intends to call Sgt. Slimp to testify at trial. (Doc. 2136 at 2 n.1; Doc. 2174 at 2.) As such, the motion (Doc. 2131) is **DENIED as MOOT.**

4. Exclusion of Benjamin Mendoza's Expert Testimony (Doc. 2132)

Gray moves to exclude the testimony of proposed Government expert witness Benjamin Mendoza. (Doc. 2132.) The Government no longer intends to call Mr. Mendoza to testify at trial. (Doc. 2136-1 at 1.) As such, Gray's motion (Doc. 2132) is **DENIED as MOOT.**

5. Exclusion of Jennifer Moore's Expert Testimony (Doc. 2134)

Gray moves to exclude the testimony of Government expert witness Jennifer Moore, arguing that her proffered testimony as to the California Employment Development Department (EDD) benefits and fraud is irrelevant, unreliable, and inadmissible. (Doc. 2134.) The Government opposes the motion, arguing that Ms. Moore's testimony is directly relevant to (1) tying legitimate and fraudulent EDD benefit claims to interstate commerce, (2) establishing how EDD fraud could serve a potential racketeering activity for the enterprise charged in both VICAR murder counts, and (3) identifying and authenticating the alleged EDD documents found at the Lomita crime scene in the victim's car. (Doc. 2178.)

*a. Qualifications and Relevance*

Ms. Moore's qualifications are not in dispute. Ms. Moore has worked at the EDD since 2020 and has been in her current role as an Employment Program Representative for the past five years. (Doc. 2178 at 2; Exh. 1 at 4.) As part of her role, Ms. Moore oversees the filing and processing of unemployment benefit claims, adjudicates eligibility issues and appeals, and makes final determinations regarding claim eligibility and benefit payments. (*Id.*) She has not previously testified as an expert at trial or in deposition, nor has she authored publications related to the topics on which she will testify. (*Id.*)

According to the Government's expert disclosure, Ms. Moore intends to testify as to the following:

> Ms. Moore will testify on the process by which individuals apply for benefits, how those benefits are determined and dispensed, and how fraud in the benefits system is identified and addressed. She is also expected to testify about the sources of EDD funding, including funding it receives from state and federal agencies for various programs within the EDD system. The government also intends to ask her to testify about the EDD documents found at the scene of the double homicide in this case, to give her opinion on whether they appear to be EDD documents of the type used in the unemployment benefit claims process. Her opinions will be based on her years of experience in this field and her familiarity with EDD documents, policies, and procedures, as well as on her review of the documents that were found at the scene of the homicide in Lomita.

(Doc. 2178 at 2; Exh. 1 at 4–5.) The Court finds that Ms. Moore is qualified to testify in these areas from her years working for EDD, which has provided a base of professional knowledge of,

and experience with, EDD benefits programs, sources of funding, and fraud detection.

The bulk of Gray's objection to Ms. Moore's testimony relates to the Government's failure to demonstrate the relevancy of EDD fraud in the present case, given that Gray was not charged with EDD fraud nor was he charged with RICO conspiracy in the Fourth Superseding Indictment. (Doc. 2134 at 5.) The Court finds such objections unavailing. As with all testimony, expert testimony is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." Fed. R. Evid. 401. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). The Court is "not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id*. at 969–70; *see also* Fed. R. Evid. 702(a) (expert testimony is admissible if it will "help the trier of fact to understand the evidence or to determine a fact in issue"). Contrary to Gray's assertions, Ms. Moore's testimony regarding EDD fraud is directly relevant to proving multiple elements of the VICAR statute, 18 U.S.C. § 1959, under which he is charged.

First, Ms. Moore's proffered testimony will provide context for additional enterprise evidence establishing EDD fraud as one of the AB's ongoing racketeering activities. Here and in the Fourth Superseding Indictment, the Government alleges that the AB enterprise has a well-documented record of collecting revenue through EDD fraud, especially during the Covid-19 pandemic years. Ms. Moore's testimony regarding the nature of the EDD benefits system is relevant to assisting the jury in understanding the mechanisms allegedly used by the AB to conduct EDD fraud through both incarcerated individuals and those on the outside. Second, given her specialized knowledge about sources of funding for EDD's benefits program, Ms. Moore's testimony will be relevant to show that EDD fraud conducted by the AB enterprise affected interstate commerce, another element of the VICAR statute.

The fact that Gray is not formally charged with EDD fraud is not singularly dispositive as to the relevancy of Ms. Moore's testimony. *See United States v. Baez*, 349 F.3d 90, 93 (2d Cir. 2003) ("It is well settled that in prosecutions for racketeering offenses, the government may

introduce evidence of uncharged offenses to establish the existence of the criminal enterprise.") In its opposition, the Government notes its intent to introduce evidence at trial that Gray was ordered by the AB to carry out the murders, in part, to further the AB enterprise's EDD fraud racket. (Doc. 2178 at 4.) In particular, the Government cites the discovery by law enforcement personnel of a significant amount of EDD paperwork in one of the murder victim's vehicles at the Lomita crime scene. Notably, the EDD paperwork appeared to be in the names of individuals other than the murder victim, which is directly relevant to the Government's theory that such paperwork was unauthorized and/or fraudulent. Not only can Ms. Moore's testimony assist in identifying and understanding the nature of the EDD documents found at the murder scene, but it may help the trier of fact to understand whether the AB enterprise may have sought out and utilized such documents in furtherance of an EDD benefits fraud scheme.

In sum, the Court finds Ms. Moore to be qualified to testify as an expert on the topics proffered in the Government's disclosure letter. Furthermore, the Court also finds that the Government has demonstrated Ms. Moore's testimony to be relevant and helpful to the jury.

*b. Reliability*

Again, Ms. Moore's reliability is undisputed. The Court "has discretion to decide how to test an expert's reliability[,] as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (quotations and footnote omitted); *see also Howard*, 2017 WL 2662469, at *2 ("'[T]he test of reliability is flexible,' and *Daubert*'s list of factors to consider, such as whether the method can or has been tested or is subject to peer review, 'neither necessarily nor exclusively applies to all experts or in every case.'") (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). For the reasons stated above, the Court finds that in this case, the methods employed by Ms. Moore are reliable. On this ground, the motion (Doc. 2134) is **DENIED**.

6. Exclusion of Danielle Ponce de Leon's Expert Testimony (Doc. 2135)

Gray moves to exclude the testimony of Government expert witness Danielle Ponce de Leon, arguing that her proffered testimony on cell site location data is irrelevant and unreliable. (Doc. 2135.) The Government opposes the motion and argues that Ms. Ponce de Leon's

testimony is reliable, relevant, and helpful to the trier of fact. (Doc. 2171.) Ms. Ponce de Leon testified as an expert on cell cite location data during the 2025 trial of three of the codefendants in this case. (*See* Doc. 1767 at 39–136.) Gray does not dispute her qualifications or that her testimony is relevant within the meaning of 702. (*See* Doc. 1460; Doc. 1673 at 22.) In her 14 years of being a crime analyst for the Los Angeles Sherriff's Department, she supported hundreds of homicide investigations, through, *inter alia*, cell tower and toll analysis.[16] (Doc. 2171 at 3.) Some of her duties have included "identifying phone numbers associated to targets and suspects; obtaining, interpreting, and managing call detail records, cell tower information, historic specialized location data, and billing records; cellular telephone tower triangulation, and 'real time' and historical GPS data to locate a suspect, witness, victim or evidence; use of specialized software available to law enforcement to acquire and process this information, including creation of charts, tables, and maps based on the data acquired." (*Id.*)

As to Gray's argument that "the methodology underlying historical cell site data analysis fails to measure up to the standards set by *Daubert*" (Doc. 2135 at 5), the Court previously found that the "methods employed by Ms. Ponce de Leon are reliable." *United States v. Bash*, No. 1:20-CR-00238 JLT SKO, 2025 WL 51210, at *16 (E.D. Cal. Jan. 8, 2025). Furthermore, the

---

[16] The Seventh Circuit helped define "historical cell site analysis" in *United States v. Hill*:

> Historical cell-site analysis uses cell phone records and cell tower locations to determine, within some range of error, a cell phone's location at a particular time. A cell phone is essentially a two-way radio that uses a cellular network to communicate. Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of A Cellular Phone,* 18 Rich. J.L. & Tech. 3, 5 (2011). Each cell tower covers a certain geographic area. That geographic area depends upon "the number of antennas operating on the cell site, the height of the antennas, topography of the surrounding land, and obstructions (both natural and manmade)." *Id.* In urban areas, cell towers may be located every one-half to one mile, while cell sites in rural areas may be three to five miles apart. *Id.* When a cell phone user makes a call, the phone generally "connect[s] to the cell site with the strongest signal," although "adjoining cell [towers] provide some overlap in coverage." *Id.* While the proximity of the user is a significant factor in determining the cell tower with which the cell phone connects, it is not the only one. *Id.* Other factors include the towers' technical aspects, including geography and topography, the angle, number, and directions of the antennas on the sites, the technical characteristics of the relevant phone, and "environmental and geographical factors." *Id.* at 7.

818 F.3d 289, 295–96 (7th Cir. 2016).

Government intends to present evidence corroborating this testimony further buttressing the reliability of the use of cell site data. (Doc. 2171 at 8.) Accordingly, the Court finds that in this case, Ms. Ponce de Leon is qualified to testify as to cell site location data, and that the methods employed by her are reliable and relevant as to the circumstances of the instant case. *See Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir. 2010) (quotations and footnote omitted). Thus, for the foregoing reasons, the motion (Doc. 2135) is **DENIED**.[17]

7. <u>Exclusion of Special Agent Brendon Diggle's Expert Testimony (Doc. 2136)</u>

Gray moves to exclude the testimony of Government expert witness Special Agent Brendon Diggle as inadmissible under Rule 702 and *Daubert*, irrelevant, unreliable, and a violation of his process and confrontation rights (Doc. 2136 at 1.) The Government opposes the motion, arguing that SA Diggle's testimony as a gang expert is relevant, reliable, and admissible because it will help the jury understand the AB's structure and operations based upon his experience and independent judgement. (Doc. 2174.)

*a. Qualifications and Relevance*

As with other Government experts, Gray does not challenge the qualifications of SA Diggle, who has worked for the California Department of Corrections and Rehabilitation for over nine years and is a member of the CDCR Office of Correctional Safety, Special Service Unit, Gang Intelligence Operations. (Doc. 2174 at 2.) The Government provided notice of SA Diggle's qualifications and the opinion and bases for his testimony on June 29, 2026, in an expert witness disclosure to defense counsel. (*See* Doc. 2174, Exh. 1 at 2–3.) The disclosure provides the following regarding his qualifications:

> SA Diggle investigates gang activity throughout CDCR. His experience includes investigations related to Security Threat Groups ("STG"), including the Aryan Brotherhood ("AB"). SA Diggle has studied and observed AB's methods of operation, criminal activities, gang terminology, trends, rivalries, alliances, tattoos, and symbols. SA Diggle also assists outside agencies with investigations relevant

---

[17] Gray requests that the Court "preserve the issue in case factual or legal developments undercut the reliability findings regarding historic cell site location data evidence and methodology." (Doc. 2135 at 6.) If such factual circumstances arise, the defense may raise this issue with the Court outside the presence of the jury.

> to prison gangs and their influence within the community. While assigned to Special Service Unit - Sacramento, SA Diggle has participated in special assignments with state law enforcement agencies and is involved in investigations into the criminal activities of the AB throughout California. SA Diggle also assists outside agencies with investigations of prison gangs and their influence within the community.

(*Id*. at 2.) The Government's supplemental disclosure letter indicates that SA Diggle will testify to the following topics and opinions:

- The AB's "history and roots in the California prison system;
- The AB's membership, structure, codes of conduct, symbols, tattoos, purposes, and slang;
- How the AB enforces its rules, code of conduct, and promotes discipline among the enterprise;
- The AB's control/subordination of white inmates and other disruptive groups;
- The AB's rival gangs and their membership process, structure, symbols, and codes of conduct;
- How the AB includes "made" members and associates; and
- The meaning of coded language and/or slang used by AB members.

(Doc. 2174 at 3, Exh. 1 at 2.) The Government's disclosure letter also contained specific details about SA Diggle's bases for his opinions:

> SA Diggle's testimony will be based on more than nine (9) years working in California prisons, including work as a gang expert within CDCR's Gang Intelligence Operations unit. He has received formal training in gang structure and organization, including specific training about the structure and organization of the AB. His testimony will also be based on interviews with dozens of AB gang members and associates, facilitators, and allies, including debriefing AB gang members and associates. In addition, SA Diggle's opinions about the AB will come from observations made throughout his career, as detailed in his curriculum vitae. SA Diggle has taught law enforcement classes about the AB across the western United States. He has provided over 20 hours of training to law enforcement officials about gangs.

(*Id*.)

To qualify as an expert under Rule 702, a witness's "knowledge, skill, experience, training, or education . . . need only exceed the common knowledge of the average layman," a

liberal standard. *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (cleaned up). Ninth Circuit precedent permits law enforcement professionals to offer expert testimony based on experience and training. *See*, *e.g.*, *Holguin*, 51 F.4th at 845; *United Sates v. Figueroa-Lopez*, 125 F.3d 1241, 1246–47 (9th Cir. 1997). In allowing this testimony, "[a] law enforcement expert can reliably testify about the structure and activities of criminal organizations based solely on experience." *Holguin*, 51 F.4th at 856 (officers' training and experience reliably supported testimony about gang "structure and operation") (citing *United States v. Rodriguez*, 971 F.3d 1005, 1018 (9th Cir. 2020)); *United States v. Hankey*, 203 F.3d 1169 (9th Cir. 2000) (permitting officer testimony about gang tenets, including "code of silence," based on his "street intelligence" and experience from investigations); *United States v. Yandell*, No. 2:19-CR-00107-KJM, 2023 WL 8948267, at *4 (E.D. Cal. Dec. 28, 2023) (noting that the Ninth Circuit has long permitted law enforcement experts to testify about gang structure and operations based on their experience) (citing *Holguin*, 51 F.4th at 856)).

The Court has considered the Government's disclosure letter and SA Diggle's *curriculum vitae*, which details his various investigative roles within the California prison system over the course of his nine-year career. Based on SA Diggle's extensive experience, the Court finds SA Diggle is qualified to testify as an expert. *Holguin*, 51 F.4th at 854 ("Law enforcement professionals are routinely qualified to offer expert testimony based on their training and experience."). The Court also finds that the Government has demonstrated that SA Diggle has relevant and helpful expertise based on his extensive training and experience as a prison gang investigator specializing in the AB.

*b. Reliability*

Gray contends that SA Diggle's testimony is unreliable because it is "based on his career and experience, not any methodology" and because "[i]nterviews with inmates and career criminals are not reliable sources of information." (Doc. 2136 at 6–7.) Whether an expert's testimony is reliable is "an inquiry that focuses not on 'what the experts say,' or their qualifications, 'but what basis they have for saying it.'" *Holguin*, 51 F.4th at 854 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995)). "A law enforcement

expert can reliably testify about the structure and activities of criminal organizations based solely on experience." *Id.* at 856 (noting that "reliability" "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it") (quoting *Hankey*, 203 F.3d at 1169).

Cory Perryman, the Government's expert in *Yandell*, was similarly qualified to SA Diggle. Perryman was also an experienced agent in the CDCR Gang Intelligence Operations unit who testified as a "CDCR gang expert." *Yandell*, Case No. 2:19-CR-00107-KJM, Doc. 1923 at 2. The Government in *Yandell* planned to ask Perryman to offer expert opinion about the AB's "history, its membership, structure, codes of conduct, symbols, purposes, and slang." *Id*. This is nearly identical to the topics SA Diggle will testify to, and for this reason the Court finds *Yandell* particularly helpful. Addressing these generalized topics on which Perryman intended to testify, the court explained:

> Many of Perryman's opinions will simply "educate the factfinder on general principles," Fed. R. Evid. 702, advisory committee notes to 2000 amendments, such as the Aryan Brotherhood's structure and goals, *see* Suppl. Perryman Not. at 1–2. Offering expert opinions about general principles is a "venerable practice" that the Rules of Evidence have long permitted. Fed. R. Evid. 702, advisory committee notes to 2000 amendments. Because Perryman is qualified, and because his opinions likely will be helpful to explain to the finder of fact "a secretive group of people with a day-to-day life foreign to those on the outside," Mot. Exclude at 3, the government need only show his general-principles opinions are "reliable" and "fit the facts of the case," Fed. R. Evid. 702, advisory committee notes to 2000 amendments (quotation marks omitted).
>
> Some of Perryman's opinions also will be more specific to this case: he likely will explain what specific words or phrases mean, and he likely will testify that in his opinion, defendants Yandell, Sylvester and Troxell are in fact members of the Aryan Brotherhood. *See* 22 Suppl. Perryman Not. at 3. Although his testimony will be based on his personal experience and not some systematic or scientific methodology, that does not make his opinions or his methods unreliable. *See Kumho Tire*, 526 U.S. at 150.

*Yandell*, Case No. 2:19-CR-00107-KJM, Doc. 1923 at 6.

SA Diggle's opinions, at least insofar as they are set out in his expert report, are similarly general. His *curriculum vitae* and the Government's expert notice highlight SA Diggle's extensive background in the prison context and significant exposure to the inner workings of

prison gangs. Furthermore, he has taught law enforcement officials about prison gangs and about the AB specifically across the western United States, thus "distill[ing] and synthesiz[ing]" his knowledge through experience. *United States v. Vera*, 770 F.3d 1232, 1239 (9th Cir. 2014).

Contrary to Gray's assertions, SA Diggle's testimony does not appear to be based upon "subjective belief or unsupported speculation." (Doc. 2136 at 7, citing *Daubert*, 509 U.S. at 590.) Not only has SA Diggle received formal training in gang structure and organization, including specific training about the structure and organization of the AB, his testimony will also be based on interviews with dozens of AB gang members and associates, facilitators, and allies. Thus, as the Ninth Circuit explained in *Holguin*, SA Diggle has used "his own experience as an investigator, including what he learned from these sources, to form conclusions about how [the Aryan Brotherhood] operates." *Holguin*, 51 F.4th at 856. "The same experience [would allow him] to testify reliably about gang terminology familiar from investigations." *Id*. The Court agrees. It appears that SA Diggle's experience provides a reliable basis for his opinions.

*c. Due Process and Confrontation Concerns*

Gray argues that the admission of SA Diggle's "vague, conclusory, and prejudicial expert witness testimony" violates his rights under the due process clause of the Fifth Amendment and the Confrontation Clause of the Sixth Amendment. (Doc. 2136 at 7.) Gray argues that SA Diggle's anticipated testimony "will serve as a conduit for testimonial hearsay" and is based on years of uncatalogued interviews with AB connected individuals, "the contents of which are not memorialized in any way the defense can access, replicate, or test." (*Id*.) The Court agrees with the Government that neither the facts of the instant case nor the law support Gray's arguments.

The Supreme Court held in *Crawford v. Washington* that a defendant's Confrontation Clause rights are violated by the admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination. 541 U.S. 36, 53–54 (2004). However, it is well-established that an expert witness may offer opinions based on such inadmissible testimonial hearsay, as well as any other form of inadmissible evidence, if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. Consequently,

there is generally no *Crawford* problem when an expert "appli[es] his training and experience to the sources before him and reach[es] an independent judgment." *United States v. Gomez*, 725 F.3d 1121, 1129 (*quoting United States v. Johnson*, 587 F.3d 625, 635 (4th Cir.2009)). The District Court came to the same conclusion in *Yandell* regarding AB expert Perryman. *Yandell*, No. 2:19-CR-00107-KJM, 2023 WL 8948267, at *5 ("But ordinarily, an expert's opinions and their bases do not violate the Confrontation Clause, including in situations like this one.").

Gray does not identify any testimony that merely serves as a conduit for inadmissible hearsay or content that investigators do not typically rely on the types of sources used in forming opinions about gang operations. *See Holguin*, 51 F.4th 856 (rejecting argument that expert testimony was conduit for hearsay where expert did not "directly repeat[ ] what someone else told him" and defendants did not show that gang investigators would not rely on the types of sources at issue). The Court declines to guess now, without more context, whether SA Diggle will "repeat repackaged testimonial hearsay or rather will offer an original product, i.e., his opinions." *Yandell*, No. 2:19-CR-00107-KJM, 2023 WL 8948267, at *5 (citations and quotations omitted). The defense may object at trial if a particular disclosure would deprive them of their rights under the Confrontation Clause. Thus, for the foregoing reasons, Gray's motion (Doc. 2136) is **DENIED**.

**E. Motion to Preclude or Limit Testimony of Brandon Bannick (Doc. 2146)**

Gray next moves to exclude the testimony of Brandon, aka "Bam Bam," aka "Bam," Brannick, arguing that the inclusion of such "tainted" testimony at trial would run afoul of Rule 403 and constitute a violation of his due process and fair trial rights. (Doc. 2146 at 1.) Gray asserts that Bannick's testimony is tainted by (1) his cooperation agreement, (2) the timing of his entry into the cooperation agreement, and (3) his general lack of credibility and reliability. (*Id.*) The Government opposes this motion, arguing that Gray has failed to demonstrate that testimony of Brandon Bannick should be excluded under Rule 403 as unduly prejudicial or otherwise irrelevant.

Brandon Bannick is a codefendant in the instant case. In its Third Superseding Indictment filed on June 3, 2024, the Government charged Brannick with one count of conspiracy to

participate in a racketeering enterprise in violation of 18 U.S.C. § 1962(d) and four counts of murder in the aid of racketeering in violation of 18 U.S.C. § 1959(a)(1). (Doc. 1098-1 at 24–25.) As relevant here, two of the four counts of murder in the aid of racketeering pertained to the murders of Victim-1 and Victim-2 during the October 2020 shooting in Lomita, California. (Doc. 1098 at 14–15.)

Bannick ultimately plead guilty to Count One of the Third Superseding Indictment (conspiracy to participate in a racketeering enterprise in violation of 18 U.S.C. § 1962(d)) and Counts Two and Five (murder in the aid of racketeering in violation of 18 U.S.C. § 1959(a)(1)).[18] (Doc. 1680 at 1.) In the Factual Basis for the Plea Agreement, Bannick admitted to the following:

> Brandon BANNICK admits that beginning no later than in or around 2015 and continuing to March 1, 2023, there was an agreement between two or more persons to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(c). BANNICK joined the agreement knowing of its purpose and intending to help accomplish that purpose.
>
> More specifically, BANNICK admits that he knew co-conspirators were Aryan Brotherhood ("AB") members based upon their long-time association and based upon admissions made by the co-conspirators to BANNICK, and BANNICK's association with the AB.
>
> As part of this criminal agreement, BANNICK admits that (1) he knowingly associated with the AB; (2) the AB was a criminal enterprise regularly engaging in a pattern of racketeering activity including murder, assault, conspiracy to commit murder, burglary, extortion, and drug trafficking; (3) knowingly agreed to participate in the conduct of the affairs of the AB; (4) these activities affected interstate commerce; and (5) he was aware of the essential nature and scope of the AB's criminal enterprise and intended to participate in it.
>
> BANNICK also admits the following:
>
> On October 4, 2020, BANNICK aided and abetted the murder of Victim-I, who was shot and killed in Lomita, California. BANNICK admits that he was aware beforehand, that orders to kill Victim-1 had been given.
>
> As part of this Plea Agreement, the defendant admits that, as part of the RICO conspiracy charged in Count One, he willfully, deliberately, and with premeditation, aided and abetted and murdered Victim-I…to maintain his status within the Aryan Brotherhood. This

[18] Counts Three and Six are still in place, with the Government having agreed to move for dismissal of those counts at the time of Bannick's sentencing.

> factual recitation does not include all details of the aforementioned criminal acts.

(Doc. 1680 at 10, Exh. A, Factual Basis for Plea.) Bannick entered signed the plea deal on January 10, 2025—just before the trial of him and three codefendants was set to start. Months prior, the Government had made pre-trial disclosures pursuant to a protective order, including co-conspirator statements and *Jencks* material, which was presumably available for Bannick to review. (Doc. 1355). Following his entering into a plea agreement, Bannick was called as a Government witness during the January 2025 trial to testify about his role in the 2020 Lomita shootings and about how his own conduct and the conduct of other codefendants related to the AB enterprise. (*See* Doc. 1786 at 113–184.)

Gray now attacks Bannick's credibility as a potential witness, speculating that Bannick's access to pretrial disclosures may have allowed him to tailor his testimony to align with the Government's theory of the case and in turn obtain favorable consideration from the Government at sentencing. (Doc. 2146 at 4.) Gray does not contend that Bannick's testimony as an eyewitness to the Lomita shootings would be irrelevant under Rule 401, but instead argues that, given the "unique circumstances" surrounding Bannick's plea and prior court testimony, his testimony should be excluded under Rule 403 as unfairly prejudicial and incredible as a matter of law. (*Id*. at 5.)

Rule 403 is specific as to what must substantially outweigh the probative value of evidence for a court to exclude that evidence—"unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. As noted by the Government, Rule 403 does not contemplate excluding the testimony of a potential cooperating witness based on a speculative danger that said witness is non-credible. In fact, the Ninth Circuit has long held that "it is the exclusive function of the jury to determine the credibility of the witnesses, resolve evidentiary conflicts and draw reasonable inferences from proven facts." *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) (internal quotations and citations omitted); *United States v. Preston*, 873 F.3d 829, 836 (9th Cir. 2017). As to Gray's assertions that there exists some extreme circumstances where witness testimony is incredible as a

matter of law,[19] the Government correctly notes that while the Ninth Circuit recognizes that a witness's factual incredibility may be grounds for granting a judgment of acquittal, *United States v. Tam*, 240 F.3d 797 (9th Cir. 2001) (citing *United States v. Croft,* 124 F.3d 1109, 1125 (9th Cir.1997)), such challenges are premature at the pre-trial stage.

Having heard Bannick's testimony before, it does not require much imagination for the Court to predict that such testimony will be prejudicial to Gray. "The fact that evidence is damaging or harmful to the party against whom it is introduced does not provide grounds for its exclusion under Rule 403." *Lehtonen v. Gateway Cos.*, No. 2:04-cv-00625-KJD-GWF, 2007 WL 9733696, at *5 (D. Nev. Aug. 27, 2007). Furthermore, the Court agrees with the Government that preclusion of Bannick's testimony under Federal Rules of Evidence 401 and 403 at the motion *in limine* stage is unsupported by law. As such, the motion (Doc. 2146) is **DENIED.**

### F. Motion to Exclude Certain Government Exhibits (Doc. 2147)

Gray seeks to exclude certain exhibits identified by the Government in its preliminary exhibit list provided to Gray on July 2, 2026.[20] (Doc. 2147.) The Government opposes the motion generally, on the grounds that it is premature and that the evidentiary rulings requested by Gray should be deferred until trial. (Doc. 2175.) Though there is merit to the Government's contention that resolving this motion in the context of trial would aid the Court in assessing the relevance and admissibility of evidence, the Court finds that the existing record provides an adequate basis to make some determinations at the present time.

1. Autopsy Reports

Gray moves to exclude the autopsy reports of both victims (Gov. Exhs. 11, 19) as impermissible hearsay, cumulative evidence, and unfairly prejudicial. (Doc. 2147 at 2.) The

[19] Gray cites multiple out of circuit cases for an "exception" to the bedrock principle that witness credibility determinations belong to the jury. (Doc. 2146 at 5, *citing United States v. Garcia*, 405 F.3d 1260 (11th Cir. 2005) and *United States v. Feliciano*, 761 F.3d 1202 (11th Cir. 2014)). The Government distinguishes these cases from a procedural standpoint, noting that both cases contemplate courts making witness credibility determinations when ruling on post-trial Rule 20 motions.

[20] Gray notes that many of the exhibits on the Government's Preliminary Exhibit List remain covered by a protective order. To the extent that Gray and the Government use broad terms to describe the exhibits at issue, the Court will follow suit.

Government reported at the hearing that it intends to call the doctors who performed the autopsies and authored the autopsy reports. Even still, it seems apparent that the reports may be admitted under a hearsay exception. *See* Fed. R. Evid. 803(6)[21]; *U.S. v. De La Cruz*, 514 F.3d 121, 133 (1st Cir. 2008) (concluding that autopsy reports fall within business records hearsay exception and that "business records are expressly excluded from the reach of *Crawford*"), *cert. denied*, ––– U.S. –––; *U.S. v. Feliz*, 467 F.3d 227, 233-37 (2d Cir. 2006) (similar).

Given that the manner in which the victims died is uncontested and that ample evidence in the form of testimony and autopsy photographs shows that victims died as a result of gunshot wounds, the Court additionally finds that the autopsy reports are neither cumulative nor unfairly prejudicial and are relevant to proving an element of the crime. For the foregoing reasons, Gray's request to exclude Government's Exhibits 11 and 19 is **DENIED**.

2. Crime Scene and Autopsy Photographs

Gray seeks to exclude 13 photos taken during the autopsies of the victims (Gov. Exh. 13–18, 20–25, 27) and 27 photos taken of the crime scene (Gov. Exh. 41–45, 48, 52–56, 62, 65–75, 77–79) as not relevant, cumulative evidence, and unfairly prejudicial. (*See* Doc. 2147 at 2–3.) Death images "may appeal to the jury's sympathies, arouse jurors' sense of horror, provoke a jury's instinct to punish, and trigger other intense human reactions." *See Silva v. Chung*, 2019 WL 2195203, at *3 (D. Haw. May 21, 2019); Weinstein's Federal Evidence § 403.04[1][c]; *see also Sanchez v. Jiles*, 2012 WL 13005996, *5 (C.D. Cal. June 14, 2012) (explaining that with autopsy photos, "[t]here is a strong possibility that such photographs will inflame the jury's sympathies and distract them from the relevant issues in dispute," and excluding cumulative and inflammatory photos).

The Court agrees with the Gray that the introduction of unnecessary or unnecessarily

---

[21] Under Rule 803(6), the business records exception to hearsay is available where the record is (1) made or based on information transmitted by a person with knowledge at or near the time of the transaction; (2) made in the ordinary course of business; and (3) trustworthy, with neither the source of information nor method or circumstances of preparation indicating a lack of trustworthiness. It is up to the Court's discretion to determine whether the circumstances surrounding a document indicate untrustworthiness. *SEC v. Jasper*, 678 F.3d 1116, 1123 (9th Cir. 2012). Notably, both autopsy reports were made two and nine days after the deaths (*See* Gov. Exh. 11; Gov. Exh. 19.) Also, Gray has failed to demonstrate that the autopsy records lack trustworthiness.

graphic photographs may result in undue prejudice. A review of the photographs taken at the crime scene show both victims' injuries at various angles and the belongings the victims had on their person at the time of the shooting. Most of the victims' injuries are depicted again in photos taken during the autopsy and, while still graphic, most of the autopsy photos are presented in a clinical fashion, thus minimizing their shock factor.

The Court finds that the probative value of *a reasonable number* of photos is significant, and the prejudicial effect is not unfair. However, the Court will not allow the presentation of cumulative evidence. Thus, the Government **SHALL** determine which of the photos it intends to use during the trial and provide that information to the defense **no later than August 7, 2026**. As noted at the hearing, the Court will not permit photos that are irrelevant to the issues or are unnecessarily provocative, including photos of the bodies depicting full frontal nudity, close-up photos of the faces of the victims, or the bloody scene after one or more of the bodies have been moved or removed. The Court anticipates that the Government will use no more than about 5 to 10 photos, which include the victims at the scene and the necessary autopsy photos. On the other hand, Gray may use the photos he needs for his defense.

If the Government believes in good faith that additional photos are required, the Government may raise the issue outside the presence of the jury. At that time, the Government will be required to detail to the Court exactly why each additional photo is necessary and to identify its permissible purpose. Consequently, Gray's request to exclude Government's Exhibits 13–18, 20–25, 27, 41–45, 48, 52–56, 62, 65–75, and 77–79 is **GRANTED IN PART** and **DENIED IN PART**.

3. Gray's Facebook Messages

Gray next moves to exclude two sets of Facebook messages as lacking foundation, irrelevant, and unfairly prejudicial.[22] (Gov. Exhs. 31, 33.) Exhibit 31 shows messages and calls between Gray and an individual involved in the murder, and Exhibit 33 shows messages between

[22] On July 2, 2026, the parties filed a joint stipulation as to the admissibility of certain records. (Doc. 2141.) As relevant here, the parties stipulated that under Federal Rule of Evidence 902(11), the Meta account records and information for Facebook account belonging to Defendant are admissible as the records of a regularly conducted activity of the entity from which they originate, without need for the testimony of a custodian of records. (*Id.*)

Gray and another individual in the hours and days following the murders. To the extent the Government seeks to introduce these exhibits as part of its case-in-chief, it has not established how it intends to lay a foundation to introduce such messages, either through witness testimony or otherwise. Accordingly, until such time as the Government seeks to introduce Exhibits 31 and 33, the ruling on their admissibility as part of the Government's case-in-chief is **RESERVED**. Before any party seeks to introduce Exhibit 31 or 33, the offering party **SHALL** address the issue with the Court outside the presence of the jury.

4. Demonstratives

Gray moves to exclude Government Exhibits 95 and 96, which appear to be placeholders in lieu of summary charts and/or demonstratives depicting "Aryan Brotherhood Members and Associates" and "Persons Involved in the Lomita Homicides." (Doc. 2147.) Additionally, Gray argues that such demonstratives and associated photos to be displayed as part of the demonstratives (Gov. Exhs. 4, 5) are inadmissible due to lack of proper foundation and as irrelevant. (*Id.*)

Though such demonstratives have not been made available to the Court for review, Federal Rule of Evidence 1006 governs the admissibility of summary charts and provides the following:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006.

The underlying materials that provide the content for the summaries or charts need not be separately admitted into evidence. *United States v. Meyers*, 847 F.2d 1408, 1411–12 (9th Cir. 1988); *United States v. Milkiewicz*, 470 F.3d 390, 396 (1st Cir. 2006). A chart summarizing voluminous or complex information can itself be evidence under Rule 1006, if a party seeking to introduce the chart has laid a foundation for the underlying materials. *United States v. Hemphill*, 514 F.3d 1350, 1358–59 (D.C. Cir. 2008). To be admissible as substantive evidence under Rule

1006, the chart must summarize the underlying materials "accurately, correctly, and in a nonmisleading manner." *United States v. Bray*, 139 F.3d 1104, 1110, 1112 (6th Cir. 1998); *United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004).

To the extent that the Government intends to present demonstratives/and or summary charts depicting connections between various AB members and associates and their relation to the Lomita shootings, such information will assist the jury in reviewing the evidence and is relevant to further demonstrating the connections between members of the AB enterprise and their connections to the murders. Therefore, the Government is permitted to introduce summary charts as substantive evidence if it lays a proper foundation and either admits or demonstrates the admissibility of the underlying materials provided in the summary charts. Consequently, Gray's request to exclude Government's Exhibits 4–5, and 95–96 is **DENIED**.

The remaining exhibits objected to by Gray have been addressed by the Court in Gray's other motions (Docs. 2126, 2132, 2134, 2135) are therefore **DENIED as MOOT**.

## IV. GOVERNMENT'S MOTIONS

### A. Reference to Potential Punishment of Defendant (Doc. 2142)

The Government seeks to preclude reference to any penalty or punishment facing Gray at any time during trial, including references to his initial death penalty eligibility.[23] (Doc. 2142.) Gray opposes the motion on the grounds that such an order is "unnecessary, overbroad, and problematic." (Doc. 2157.)

"It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict." *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1992). The Supreme Court explained that providing jurors information concerning the consequences of their verdict "invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Shannon v. United States*, 512 U.S. 573, 579 (1994); *see also United States v. Dredd*, 833 F. App'x 79, 82 (9th Cir. 2020) (extending *Shannon* rationale to jurors being provided with "sentencing information of any

[23] Many defendants in this case were charged with death penalty eligible offenses over the course of four superseding indictments. (Docs. 130, 622, 1098, 1970.) On February 21, 2024, notice was provided to all defendants in this case, including Justin Gray, that the Government would not seek the death penalty.

kind"). Thus, except for capital trials, the jury "should be admonished to reach its verdict without regard to what sentence might be imposed." *Id*. (internal quotation marks omitted); *see also United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1991) ("It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict.").

Accordingly, the Government's motion *in limine* is **GRANTED**. Neither party shall reference, directly or indirectly, any potential sentence, punishment, or penalty presented in this case. The jury will also be instructed that such issues are within the exclusive province of the Court and are not to be considered in arriving at a verdict. *United States v. Scarmazzo*, 554 F. Supp. 2d 1102, 1109 (E.D. Cal. 2008), *aff'd sub nom. United States v. Montes*, 421 F. App'x 670 (9th Cir. 2011); Model Crim. Jury Instr. 9th Cir. 6.22 (March 2025) ("The punishment provided by law for this crime is for the court to decide. You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.").

**B. Reference to Death Penalty Eligibility of Cooperator's Offenses (Doc. 2143)**

The Government seeks to preclude any reference by defense counsel to any of the Government's anticipated cooperating witnesses' initial exposure to the death penalty. (Doc. 2143.) The Government attests that no cooperating witnesses anticipated to testify in the upcoming trial entered a guilty plea while facing the death penalty and that "any implication that a witnesses' testimony may be motivated by the potential imposition of the death penalty…would be contrary to the facts." (Doc. 2143 at 3.) Gray opposes the motion on the grounds that such an order is "unfairly restricts his constitutional right to confrontation and cross-examination." (Doc. 2158.)

"The Confrontation Clause of the Sixth Amendment . . . 'guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him.'" *United States v. Larson*, 495 F.3d 1094, 1102 (9th Cir. 2007) (citation omitted). Included in the Confrontation Clause is "the right of effective cross-examination," which is critical to a fair trial because "cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id*. (quoting *Davis v. Alaska*, 415 U.S. 308, 316–318 (1974)). The Ninth Circuit has endorsed a "policy favoring expansive witness cross-examination in criminal trials."

*Id*. (quoting *United States v. Lo*, 231 F.3d 471, 482 (9th Cir. 2000), holding modified by *Larson*, 495 F.3d 1094)). Furthermore, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis*, 415 U.S. at 316–17 (citation omitted).

"Trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also United States v. Dadanian*, 818 F.2d 1443, 1449 (9th Cir. 1987) (a court may limit "counsel's inquiry into the potential bias of a prosecution witness...based on concern about confusion of the issues or where the interrogation is repetitive or only marginally relevant"), *abrogated on other grounds by United States v. Monroe*, 943 F.2d 1007 (9th Cir. 1991). In *Larson,* on which the Defendant relies in his opposition, the Ninth Circuit Court of Appeals held that the district court had improperly restricted the defendant's cross-examination of cooperating witnesses about the sentences they faced, including mandatory minimum sentences in the absence of substantial assistance motions from the prosecution. *Larson,* 495 F.3d at 1104–05.

The Court is not persuaded by Defendant's argument that the fact that witnesses were charged with death eligible offenses is a proper ground for cross examination as to credibility or bias. First, to the extent the Court even understands the implication of the Defendant's characterization that the death penalty cast a "dark shadow over all the early proceedings" in this case, there is no showing how this influenced any witness to testify. Rather, the Government filed a "no seek" notice in this case as to all defendants and no witness testifying in this case faced the death penalty at the time they agreed to cooperate

As to Gray's assertion that the November 2024 election of President Trump created an atmosphere of fear that may have influenced cooperators' plea agreement negotiations in January 2025, such an assertion is speculative at best. Even if it did influence them, Gray fails to explain how this bears on whether the Gray should be able to tell the jurors that the charges filed in indictment were "death eligible." Indeed, while defense counsel argues that the President's

election may have made the cooperating witnesses fear that the death penalty would be reinstated, he fails to provide any evidence that the administration contemplated this in this case or that any witness had reason to think this was even possible. This is especially preposterous as to Brandon Bannick, who as noted by the defense, plead guilty just weeks before his trial was due to begin and there was no specter of the death penalty hovering over that trial. Furthermore, the Court sees little probative value to this evidence such that it is substantially outweighed by the danger of unfair prejudice against the Government.

Thus, the defense may not inquire of the Government's cooperating witnesses as to the fact that when the case was originally filed, many of the offenses carried the potential for the death penalty. Likewise, the defense shall not inquire into the evidence of the witnesses' presentence reports, sentencing range information in their plea agreements, cross-examine them as to the United States Sentencing Guidelines, guideline calculations, or possible sentencing ranges. *See United States v. Williams*, 39 Fed. Appx. 541, 542 (9th Cir. 2002). As such, the Government's motion *in limine* is **GRANTED in PART** and **DENIED in PART.**

**C. Exclusion of Extrinsic Evidence to Impeach Government Witnesses (Doc. 2144)**

Lastly, the Government requests an order prohibiting Gray from impeaching Government witnesses through any extrinsic evidence, including impermissible reference to prior convictions not specifically permitted under Federal Rule of Evidence 609 or the "circumstances or collateral details of any such conviction that are not probative of the truthfulness or untruthfulness of the witness." (Doc. 2144 at 1, 5.) Defendant opposes the motion on the basis that the Government's request is a vague and impermissibly restricts cross examination. (Doc. 2159.)

Federal Rule of Evidence Rule 608 permits attacks on a witness's credibility "by testimony about the witness's reputation for having a character for . . . untruthfulness, or by testimony in the form of an opinion about that character." Fed. R. Evid. 608(a). But such testimony by other witnesses is limited to "reputation" or "opinion" evidence and may not include testimony about specific instances of conduct. *Id*. Federal Rule of Evidence 609 provides that a testifying witness's character for truthfulness may be attacked by evidence of a criminal

conviction for a crime that is punishable by imprisonment for more than one year and for any crime proving a dishonest act or false statement. Fed. R. Evid. 609(a). The rule limits the use of convictions where it has been more than ten years since the conviction or release from confinement for it, whichever is later. Fed. R. Evid. 609(b).[24] "[A]bsent exceptional circumstances, evidence of a prior conviction admitted for impeachment purposes may not include collateral details and circumstances attendant upon the conviction." *United States v. Sine*, 493 F.3d 1021, 1036 n. 14 (9th Cir. 2007) (quoting *U.S. v. Rubio*, 727 F.2d 786, 797 n.5 (9th Cir. 1983)). "Generally, only the prior conviction, its general nature, and punishment of felony range are fair game for testing the [witness's] credibility." *United States v. Osazuwa*, 564 F.3d 1169, 1175 (9th Cir. 2009) (quoting *U.S. v. Albers*, 93 F.3d 1469, 1480 (10th Cir. 1996)) (quoted text in both decisions referred to "defendant's credibility" specifically).

Here, the Court is limited in its ability to truly perform the balancing test, given that the Government has not specified which cooperating witnesses they intend to call at trial, nor the exact criminal histories of said cooperating witnesses. However, the Government's citation to *United States v. Banks*, 506 F.3d 756, 773 (9th Cir. 2007), *amended,* 514 F.3d 959 (9th Cir. 2008) indicates that some of the crimes committed by the Government cooperating witnesses were committed by or on behalf of the Aryan Brotherhood enterprise. (Doc. 2144 at 5.)

Any examination of the Government witnesses' prior convictions shall be limited to timely[25] felony convictions and convictions related to the witness' honesty. Unless the witness opens the door by denying or minimizing the conduct giving rise to the conviction, inquiries **SHALL BE** limited to the fact of conviction, the name of the offense, the date of conviction, and the punishment imposed. Inquiry into circumstances or collateral details of any such conviction that are not probative of the truthfulness or untruthfulness of the witness **SHALL NOT** occur. For these reasons, the Government's Motion *in limine* (Doc. 2144) is **GRANTED IN**

[24] Rule 609(b) provides that a conviction more than ten years old is not admissible as impeachment evidence "unless the court determines, in the interest of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." Fed. R. Evid. 609(b); *United States v. Bensimon*, 172 F.3d 1121, 1125 (9th Cir. 1999).

[25] Timeliness is defined by Rule 609(b).

**PART** and **DENIED IN PART**.

**ORDER**

For the foregoing reasons, the Court **ORDERS:**

1. Gray's motions in limine (Doc. 2121, Doc. 2123, Doc. 2128) are **DENIED** in **PART** and **GRANTED in PART**.

2. Gray's motions in limine (Doc. 2127, Doc. 2134, Doc. 2135, Doc. 2136, Doc. 2146), are **DENIED**.

3. Gray's motion in limine (Doc. 2126) is **GRANTED in PART, DENIED in PART** and **RESERVED in PART**.

4. Gray's motions in limine (Doc. 1119, Doc. 2122) are **GRANTED in PART** and **RESERVED in PART** Defendant's motion in limine to exclude such evidence.

5. Gray's motions in limine (Doc. 2131, Doc. 2132) are **DENIED as moot**.

6. Gray's motion for an order requiring further designation of Rule 801(d)(2)(E) statements (Doc. 2138) is **DENIED**.

6. Gray's motion in limine (Doc. 2147) is **GRANTED IN PART, DENIED IN PART, RESERVED in PART** and **DENIED in PART as MOOT**

7. The Government's motion *in limine* (Doc. 2142) is **GRANTED**.

8. The Government's motions *in limine* (Doc. 2143, Doc. 2144) are **GRANTED in PART** and **DENIED in PART**.

IT IS SO ORDERED.

Dated: _July 31, 2026_

UNITED STATES DISTRICT JUDGE